Judge GIERKE
delivered the opinion of the Court.
A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of unpremeditated murder and disobeying the order of a superi- or commissioned officer, in violation of Articles 118 and 90, Uniform Code of Military Justice, 10 USC §§ 918 and 890, respectively. The adjudged and approved sentence provides for a dishonorable discharge, confinement for life, total forfeitures, and reduction to the lowest enlisted grade. The Court of *271 Criminal Appeals affirmed the findings and sentence.
This Court granted review of the following issue:
WHETHER THE MILITARY JUDGE ABUSED HER DISCRETION IN REFUSING TO ALLOW THE DEFENSE TO UTILIZE EXPERT ASSISTANCE AT APPELLANT’S COURT-MARTIAL.
In addition, this Court specified the following issues:
I
WHETHER THE COURT OF CRIMINAL APPEALS MADE FACTUAL FINDINGS THAT ARE UNSUPPORTED BY THE RECORD.
II
WHETHER THE EVIDENCE IS LEGALLY SUFFICIENT TO SUPPORT THE FINDINGS OF GUILTY.
III
WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN SHE REFUSED TO ALLOW A RETEST OF MATERIALS FOUND UNDER THE VICTIM’S FINGERNAILS WHEN FUNDS HAD BEEN PREVIOUSLY MADE AVAILABLE FOR DEFENSE INVESTIGATIVE ASSISTANCE AND AN EXPERT TESTIFIED THAT SUCH TESTING WAS APPROPRIATE. SEE UNITED STATES V. GARRIES, 22 MJ 288 (CMA 1986).
For the reasons set out below, we set aside the decision below and remand for further proceedings.

Factual Background

This case arose from the prosecution of appellant for the murder of Private First Class (PFC) Carla Shanklin, who was found dead in her government quarters at Helema-no Military Reservation,'Hawaii. The cause of death was determined to be “manual strangulation, either alone or in combination with one of the other forms of asphyxia,” such as use of a ligature like the necklace PFC Shanklin was wearing or “burking” — a combination of smothering and pressure on the chest.
Appellant lived with PFC Shanklin, her 3-year-old daughter, and her 15-year-old sister, Kijafa Walker, until June 23, 1995. (R. 826, 828-30, 965) On that date, appellant and PFC Shanklin had a physical altercation in her quarters. PFC Shanklin called the Military Police, who apprehended appellant and removed him from the quarters. The next day, June 24, appellant’s commander ordered him to stay away from PFC Shankliris quarters. Appellant’s conviction of willful disobedience of this no-contact order is not at issue in this appeal.
On the afternoon of July 7, 1995, the day before her death, appellant went to PFC Shankliris quarters and asked Kijafa when she would return. Kijafa told appellant that she would return at about 1:00 p.m., and appellant waited “outside walking up and down, up and down.” PFC Shanklin actually returned between 2:30 and 3:00 p.m., accompanied by Sergeant (SGT) Harris, her squad leader, who was teaching her how to drive a car with a manual transmission. They continued to drive around for about 30 minutes.
PFC Shanklin and appellant then conversed sometime between 4:00 p.m. until about 6:00 p.m., when appellant left PFC Shankliris quarters and went to the quarters of Staff Sergeant (SSG) Kimberly Rogers, with whom he was then living. Appellant and SSG Rogers had an argument that evening, which ended when Rogers told him that she “didn’t want him anymore” because she thought he was involved with another woman named Carla [PFC Shankliris first name]. According to SSG Rogers, he responded as if he “didn’t care.”
Appellant then went to the Noncommis-sioned Officers’ (NCO) Club at Schofield Barracks, where he became involved in a conversation with SSG Michael Jones about Jones’ relationship with PFC Shanklin. Although SSG Jones insisted that he was just “friends” with PFC Shanklin, appellant ended the conversation by saying, “I love her, she loves me, and may the best man win.” *272 SSG Jones noticed appellant’s white four-door Cadillac parked in the NCO Club parking lot. He last saw appellant between 7:45 p.m. and 8:00 p.m.
SSG Jones went to PFC Shanklin’s quarters, and from about 9:15 p.m. until 12:45 a.m., they drove around in Jones’ truck. They had intended to return earlier but were delayed because they had a flat tire. Appellant called PFC Shanklin at about 9:30 p.m., but her sister told him that she was not home.
Kijafa testified that she was awakened during the night by a female scream that sounded frightened and “like it didn’t get a chance to finish.” She looked into the hallway, saw nothing, and then went back to bed.
Between 4:00 and 4:30 a.m., SGT Christopher Robinson, who shared a common bedroom wall with PFC Shanklin, also heard a loud, shrill scream that “was cut off.” He then heard “a rhythmic thumping” for about 15-30 seconds. At about 5:00 a.m. he heard a car door slam.
At about the same time, Ms. Marion McCloud, who lived across the street, was awakened by a loud noise. She looked out the window and saw a white car parked in the parking lot, “which was unusual because usually no white cars parked there at night.”
The next morning, Kijafa attempted to awaken PFC Shanklin by calling her name. She noticed that PFC Shanklin was not moving, had foam coming from her mouth, and had bruises on her arm. She went outside and told SGT Robinson, who was working on his car, that she could not awaken PFC Shanklin. Kijafa asked SGT Robinson to ask his wife to come outside, and she then asked Mrs. Robinson to help her awaken PFC Shanklin. SGT Robinson and his wife went to PFC Shanklin’s bedroom, where he saw foam and blood coming from her mouth and noticed that she was cold and stiff. He also noticed that the bedroom window was open with the blinds down and a dresser seemed out of place. According to Kijafa, PFC Shanklin never opened the window.
SGT Robinson talked to the Military Police, and Kijafa paged appellant several times. When appellant called back, Kijafa told him that “something happened and you need to get over here.” After appellant repeatedly asked why, SGT Robinson took the telephone and said, “Something happened to Carla.” Appellant responded “almost jokingly,” “Why, is she dead?” SGT Robinson said, ‘Yes,” and appellant “started to cry.”
Kijafa testified that she did not tell appellant that PFC Shanklin was dead. In cross-examination, however, she admitted that she initially told an agent from the U.S. Army Criminal Investigation Command (CID) that she told appellant that PFC Shanklin “might be dead.” She testified that she was “shaken up” and answered without thinking when she talked to the CID, but she insisted at trial that she did not tell appellant that PFC Shanklin was dead.
Another soldier drove appellant to PFC Shanklin’s quarters. When the soldier asked appellant why he was crying, appellant said, “Carla’s dead.” Appellant also told the soldier that “he knew they were going to try to pin it on him because [she] was his girlfriend.”
Appellant was questioned by CID Special Agent (SA) West. Appellant told SA West that he spent the night with SSG Rogers, except for about 30 minutes around midnight when he drove his car to a Texaco station, left it there, and walked back. Appellant’s alibi was contradicted by SSG Rogers, who testified that appellant left around 11:00 p.m. and did not return until daybreak. Appellant did not testify at trial.
When he interviewed appellant, SA West observed scratches on his arms and a gouge on his index finger. SSG Rogers testified that, on July 9, appellant pointed to the scratches on his arm and said, “Girl, you tore me up,” and “Kim, you scratched me, you did scratch me.” SSG Rogers denied scratching appellant.
Mr. George Grady testified that around 9:30 a.m. on July 8, 1995, the day after PFC Shanklin’s death, appellant came to his house with a container “about the size of a shoe box” and asked him to- get rid of the box for him. As they were talking, appellant seemed nervous and said, “I — I—I did this — I did *273 something.” Mr. Grady threw the box into a dumpster without opening it.
Deoxyribonucleic acid (DNA) tests were performed on a substance found under PFC Shanklin’s fingernails, as well as blood samples taken from appellant, the other suspect, and PFC Shanklin’s daughter and sister, to determine their respective DNA profiles. The tests did not exclude the possibility that the material under PFC Shanklin’s fingernails contained the DNA of more than one person. The tests excluded all donors of DNA samples as possible sources of the material, except for appellant and PFC Shank-lin.
The prosecution’s expert, Ms. Meghan Clement, explained the testing process. She testified that the DNA from the material under PFC Shanklin’s fingernails was tested for eight separate genetic systems. Appellant’s DNA and the DNA of the material under PFC Shanklin’s fingernails matched each other in all eight genetic systems. Ms. Clement testified that all the other suspects, as well as PFC Shanklin’s sister and daughter, were excluded as possible sources because their DNA did not match the material under the fingernails in at least one genetic system.
On cross-examination, Ms. Clement testified that, after the testing of appellant’s DNA, her laboratory started testing for two additional genetic systems. Neither Ms. Clement nor any other witness stated how many known genetic systems there were at the time of trial or how many systems could have been reliably identified by the DNA test used in this case, see 55 MJ at 273-74.
The DNA evidence in this case was not tested for the two additional genetic systems. Ms. Clement opined that the possibility of excluding appellant as a donor of the DNA by testing for the two additional genetic systems was remote, because she had never seen a case where there were six or seven matches followed by a failure to match in the eighth, ninth, or tenth tests. Defense counsel did not challenge her assertion or question her regarding the number of cases on which her assertion was based.
The DNA evidence was of considerable interest to the members, as evidenced by questions from six of the eight members. Their questions pertained to the possibility of contamination of the samples, the potential for multiple contributors, the explanation for the limited readings from PFC Shanklin’s right fingernail, the possibility of mistakes in the chain of custody, and the possibility of a retest.

Expert Assistance (Granted Issue and Specified Issue III)

Before trial, appellant asked the convening authority for expert assistance. He specifically asked that Dr. Patrick Conneally, PhD, be appointed under Mil.R.Evid. 502, Manual for Courts-Martial, United States (2000 ed.), as a defense consultant on DNA evidence. He also asked that Dr. Conneally be produced at government expense as a defense expert witness. On April 4, 1996, the convening authority approved the request to employ Dr. Conneally.
At a motions hearing on April 23, 1996, defense counsel informed the military judge that Dr. Conneally had advised employing someone else who was an expert in Polymerase Chain Reaction (PCR) testing. Defense counsel informed the military judge that he was “attempting to contact Doctor Conneally to get his suggestions on someone” to perform the PCR testing. The defense filed a motion to preserve the evidence for further DNA testing and requested the convening authority to provide funds for DNA testing by an independent laboratory. The estimated cost of DNA retesting was $3000-4000. The military judge granted a defense motion to preserve the evidence for possible retesting, but the convening authority denied a defense request for funds to obtain an independent DNA test.
Dr. Conneally recommended that Dr. Edward Blake be retained. Dr. Blake operates a DNA testing laboratory in California and had indicated his willingness to conduct additional DNA testing. Dr. Blake informed the defense that LabCorp, the laboratory used by the Government, had not followed “the standard general criminal forensic testing standards” in conducting its analysis.
*274 At a motions hearing on May 15, 1996, the defense asked the military judge to order that funds be made available to hire Dr. Blake as a defense consultant and to conduct another DNA test. When asked by the military judge what would be accomplished by additional testing, defense counsel explained that they were concerned with possible contamination of the samples and misidentification of the sample taken from appellant. The military judge cautioned defense counsel, “[Djon’t make this DNA evidence into something more than it really is.”
After considerable discussion about the need for DNA retesting, defense counsel informed the military judge: “The defense position really is that we would like to substitute Doctor Blake for Doctor Conneally[.]” Defense counsel informed the military judge that $6000 was approved to retain Dr. Con-neally, but only $1000 had been spent. Nevertheless, the military judge denied the defense request, explaining her decision as follows:
It’s up to the defense to figure out from the get go who they wanted as an expert. The convening authority, in good faith, relied upon the defense representation, looked at Doctor Conneally’s qualifications. And we were litigating the issue of DNA experts earlier on face value as it was presented to the convening authority, Doctor Conneally appears to have impeccable credentials. Now, at the time that you requested the expert that was when the time was to decide who could provide the defense requested assistance. The convening authority gave the defense what they wanted and there’s nothing before me to suggest that it’s fundamentally unfair to require the defense to go with the expert that they asked for and the convening authority in good faith gave them for the purposes of preparing for trial.
The military judge left the door open for the defense to ask the convening authority to substitute Dr. Blake for Dr. Conneally. The defense asked the convening authority to substitute Dr. Blake for Dr. Conneally, but the convening authority denied the request, prompting the defense to ask for a continuance “for at least one month.” In its request, the defense asserted that the funds allocated for Dr. Conneally were sufficient to retain Dr. Blake. Finally, the defense explained its reasons for the change of experts:
The fact of the matter is that the state of Hawaii does not have any forensically trained DNA labs of testing experts and the defense therefore needed the consultation of Dr. Conneally to be pointed in the right direction to a forensic expert, such as Dr. Blake.
The military judge denied the defense request for a continuance, remarking that “there is still nothing new in this appellate exhibit that would cause me to reconsider my earlier ruling on this matter.”
Defense counsel then informed the military judge that he had not requested that Dr. Conneally be summoned to testify, and he reiterated that Dr. Conneally had recommended that the defense retain Dr. Blake to retest the DNA samples “and also because Doctor Blake has expertise in forensic and criminology where Doctor Conneally does not.” The military judge adhered to her earlier rulings and reiterated:
[Wjhen the defense makes a request to the convening authority for an expert by name and the convening authority grants it, then the convening authority can rely that the defense has done its homework and has determined that this defense expert possesses the requisite qualifications at that time.
At oral argument before this Court, appellant government counsel asserted that a retest would have delayed the trial by one and a half months. Appellate defense counsel asserted that consultation with Dr. Blake would have taken only “a couple of days,” and a retest could have been accomplished within 24 hours after Dr. Blake received the samples.
When trial on the merits began on June 12, 1996, the defense did not present any expert testimony at trial. The record does not reflect whether defense counsel consulted further with Dr. Conneally after the military judge denied the request to employ Dr. Blake.

*275
Discussion

Appellant now contends that the military judge was arbitrary and capricious in denying the defense requests to substitute Dr. Blake for Dr. Conneally, retest the unknown material found under PFC Shanklin’s fingernails, and verify that the blood samples used by the Government’s laboratory was actually appellant’s. The Government argues that appellant was provided with “more than ample expert assistance” and that the military judge did not abuse her discretion by denying the request for retesting, because appellant failed to identify any substantive defects in the chain of custody or point to any evidence of contamination.
When an accused asks for expert assistance, “he must demonstrate the necessity for” it. United States v. Garries, 22 MJ 288, 291 (CMA), cert. denied, 479 U.S. 985, 107 S.Ct. 575, 93 L.Ed.2d 578 (1986). An accused is not entitled to a specific “expert of his own choosing,” but is entitled only to “competent assistance.” United States v. Burnette, 29 MJ 473, 475 (CMA), cert. denied, 498 U.S. 821, 111 S.Ct. 70, 112 L.Ed.2d 43 (1990). We review a military judge’s decisions on requests for expert assistance for abuse of discretion. United States v. Short, 50 MJ 370, 373 (1999), cert. denied, 528 U.S. 1105, 120 S.Ct. 843, 145 L.Ed.2d 712 (2000).
The necessity for expert assistance is not at issue in this case. The only issue is whether appellant was provided “competent assistance.”
In this case, the DNA testing was done in 1995 and appellant was tried in 1996. At that time, PCR testing was relatively new. Indeed, many appellate courts were still struggling to determine if PCR testing was sufficiently reliable to be admissible. See 2 Paul C. Giannelli & Edward J. Imwinkelried, Scientific Evidence § 18-5(A) at 53-54 n. 165 (3d ed.1999); see also Federal Judicial Center, Reference Manual on Scientific Evidence [hereafter 1994 Reference Manual] 277 (1994).
With the rapid growth of forensic-science techniques, it has become increasingly apparent that complex cases require more than general practitioners. See Edward J. Im-winkelried, Expert Witness: An Unheralded Change, The National Law Journal at A10 (February 5, 2001). Well before this case was tried, courts began finding that forensic DNA testing was beyond the ken of many traditional “experts.” See 1994 Reference Manual at 63; see also Federal Judicial Center, Reference Manual on Scientific Evidence 490 (2d ed.2000) (“Courts have noted the lack of familiarity of academic experts— who have done respected work in other fields — with the scientific literature on forensic DNA typing.”).
The prosecution’s DNA expert in this ease testified that DNA initially was used for medical research, to identify genes that cause diseases. She testified that her employer, LabCorp, divided its operation into three functional areas: medical diagnosis, paternity testing, and forensic testing. Finally, she testified that, in the short time between the DNA testing of the evidence in this case and appellant’s trial, tests for two additional genetic systems were implemented at her laboratory.
Defense counsel asserted, without contradiction by the prosecution, that there were no DNA testing laboratories in Hawaii. Thus, the defense was required to find an appropriate expert in mainland United States.
Dr. Conneally’s curriculum vitae demonstrates that his expertise was in the area of medical genetics, not forensic testing. He told appellant’s defense counsel that appellant needed an expert in forensic PCR testing. Dr. Blake is an expert in forensic testing.
The substitution of Dr. Blake for Dr. Con-neally or the addition of Dr. Blake to the defense team would not have incurred any increased cost to the Government. In this case appellate government counsel have asserted that the trial might have been delayed 6 weeks, while appellate defense counsel have insisted that it would have taken only a “couple of days” for defense counsel to consult with Dr. Blake and 24 hours to retest the sample. At trial and on appeal, govern *276 ment counsel did not assert that a delay of 6-8 weeks would have prejudiced their case.
The DNA evidence was the linchpin of the prosecution case. It excluded all possible suspects except appellant. Appellant was on trial for murder, facing a life sentence, and needed the tools to competently test the prosecution’s DNA evidence. On its face, the Government’s DNA evidence appeared incomplete, because it was not subjected to the tests for two additional genetic systems that were developed after the Government’s evidence was first tested. The two additional tests were evidence of the rapid pace of development in the area of PCR testing.
While defense counsel was not as articulate as we would like in explaining why Dr. Con-neally could not provide “competent assistance,” it is clear from the record as a whole that the defense needed expert assistance in the technical aspects of PCR testing, not the general scientific principles underlying it. It is also clear from the military judge’s exhortation — “[Djon’t make this DNA evidence into something more than it really is”- — that she did not fully appreciate the complexities or importance of the DNA evidence and the rapidly advancing technology of DNA testing.
Appellant needed more than generalized expertise in genetic medical diagnosis; he needed specific assistance in the then-new and rapidly evolving techniques of PCR testing. Appellant needed an expert to testify how many genetic systems were capable of being compared with the technology then available. He needed an expert to challenge or contradict Ms. Clement’s assertion that additional tests probably would not exclude appellant as a suspect. Dr. Conneally either could not or would not provide those tools. The defense proffer was that Dr. Blake could have provided those tools at no additional cost to the Government.
The defense request for Dr. Blake was timely. Nineteen days after the request for Dr. Conneally was approved, the defense informed the military judge that they needed an expert in PCR testing. Almost a month before trial, the defense specifically requested Dr. Blake. There is no evidence of bad faith or witness shopping, and no indication that the prosecution would have been prejudiced by any delay. See generally United States v. Miller, 47 MJ 352, 358 (1997) (factors to be considered in deciding whether to delay a trial).
The military judge did not focus on the issue whether Dr. Conneally was able or willing to provide the needed expertise. Instead, she focused on taking defense counsel to task for requesting an expert who was either unable or unwilling to provide what the defense needed, i.e., expertise in PCR testing. See United States v. Weisbeck, 50 MJ 461, 465-66 (1999) (military judge abused discretion by denying expert assistance that went to heart of defense and would have delayed trial only 6 weeks, and military judge focused only on “holding the defense’s feet to the fire”).
We conclude that the military judge’s focus on holding the defense’s feet to the fire arbitrarily deprived appellant of the tools he needed. Accordingly, we hold that the military judge abused her discretion.
Although appellant did not receive the competent expert assistance that was necessary, we are unable to determine whether the court-martial’s findings of guilty were “substantially swayed by the error.” Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). In our view, the interests of justice will be best served by returning this case to the Judge Advocate General and giving appellant an opportunity to demonstrate to the Court of Criminal Appeals, with the assistance of an expert in PCR testing, how he would have changed the evidentiary posture of this case if the military judge had granted his request for Dr. Blake. See United States v. Curtis, 31 MJ 395 (CMA1990).

Legal and Factual Sufficiency (Specified Issues I and II)

Appellant asserts that the court below, 54 MJ 331, made numerous findings of fact that are unsupported by the record. Among the asserted factual errors are the following:
(1) The court below found that “Ms. McCloud saw a white car driving away” (un- *277 pub. op. at 4); she testified only that she saw a white car in the parking lot.
(2) The court below found that Kijafa Walker “ran outside and requested help” from SGT Robinson (unpub. op. at 4). Appellant asserts that Kijafa made “small talk” with SGT Robinson and then told him that she could not awaken PFC Shanklin. The record of trial reflects that Kijafa “started in with small talk” and then told SGT Robinson that she could not awaken PFC Shanklin; and that she then asked to speak with Mrs. Robinson.
(3) The court below found that appellant responded to SGT Robinson’s request to “come over to the quarters” by spontaneously asking, “Why is Carla dead?” (Unpub. op. at 4) (comma omitted after “Why” in unpublished opinion); the record reflects that Ki-jafa initially told the CID that she told appellant that PFC Shanklin “might be dead,” but that she recanted that statement at trial.
(4) The court below stated: “Appellant’s alternative explanation for the scratches [on his hands and arms] was that they occurred while he was working on his car.” Unpub. op. at 6. Appellant asserts that no member of the defense team ever claimed that he was scratched while working on his car.

Discussion

The Courts of Criminal Appeals are unique in that they are charged with “the duty of determining not only the legal sufficiency of the evidence but also its factual sufficiency.” United States v. Turner, 25 MJ 324 (CMA 1987). They must be “convinced of’ an appellant’s “guilt beyond a reasonable doubt.” Id. at 325. If our Court is in doubt whether the court below properly determined the factual sufficiency of the evidence, the remedy is to remand the case for a proper factual review of the findings of guilty. Id. Our Court “will not overturn findings of fact by a Court of Criminal Appeals unless they are clearly erroneous or unsupported by the record.” United States v. Tollinchi, 54 MJ 80, 82 (2000), citing United States v. Avery, 40 MJ 325, 328 (CMA 1994).
In this case, we need not decide whether the factual-sufficiency determination by the court below was defective, in light of our decision regarding the Granted Issue and Specified Issue III.

Decision

The decision of the United States Army Court of Criminal Appeals is set aside. The record of trial is returned to the Judge Advocate General for remand to the Court of Criminal Appeals. The Judge Advocate General will provide $5000 to appellant for employment of Dr. Blake or another equivalent expert. Thereafter, appellant will have 90 days to file supplemental pleadings with the court below, which may order a factfind-ing hearing if the additional pleadings make it necessary. The court below will reconsider the factual and legal sufficiency of the evidence in light of any additional matters submitted by appellant, taking specific cognizance of the factual errors asserted by appellant as the basis for Specified Issue I. In the alternative, the court below may order a rehearing.