**UNITED STATES**

v.

**Senior Airman Anthony W. WARNER, United States Air Force.**

**ACM 34716.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 17 May 2001.

8 Sept. 2003.

574

Appellate Counsel for Appellant: Major Kyle R. Jacobson (argued), Colonel Beverly B. Knott, Major Terry L. McElyea, Major Jeffrey A. Vires, and Major Patricia A. McHugh.

Appellate Counsel for the United States: Lieutenant Colonel Michael E. Savage (argued), Colonel LeEllen Coacher, Colonel Anthony P. Dattilo, Lieutenant Colonel Lance B. Sigmon, Major Mitchel Neurock, and Major John D. Douglas.

Before VAN ORSDOL, STONE, and ORR, Appellate Military Judges.

OPINION OF THE COURT

STONE, Judge:

The appellant was charged with two specifications of aggravated assault on his infant son in violation of Article 128, UCMJ, 10 U.S.C. § 928. At a general court-martial composed of officer and enlisted members, the appellant was found guilty of the lesser-included offense of assault and battery as to the first specification and was acquitted on the second specification. The adjudged and

approved sentence included a bad-conduct discharge, confinement for 18 months, forfeiture of all pay and allowances, and reduction to the grade of E–1.

The appellant contends: (1) The expert consultant appointed by the convening authority was incompetent, and the military judge improperly denied a defense request for a civilian expert consultant; (2) The trial counsel was improperly involved in the selection of the defense's expert consultant; (3) The military judge erred in admitting testimony about the baby's injuries as aggravation evidence and instructing the members they could consider it; and (4) The military judge erred in sustaining an objection to trial defense counsel's sentencing argument. For the reasons set forth below, we affirm.

## I. Factual Background

The appellant's son (BT) was born six weeks premature on 6 June 2000. On the morning of 22 August 2000, the appellant was at home preparing for an appointment with his commander for nonjudicial punishment proceedings pursuant to Article 15, UCMJ, 10 U.S.C. § 815. Because of the importance of the meeting with his commander, he was focused on meeting military grooming and appearance standards and was ironing his battle-dress uniform on some towels in the family's on-base home. His wife JT [1] agreed to go into town and borrow five dollars from her mother so the appellant could get a hair cut prior to his appointment. JT departed the house at approximately 1000 and returned about an hour later. BT was at home alone with the appellant during his wife's absence.

Upon her return, JT encountered her husband holding BT in his arms. The baby was crying but not producing any tears, and the baby's arms and legs were "slumped over." JT asked her husband what happened. He explained to her he was holding BT in his left arm with the baby's head facing him while he ironed with his right. He said that while holding BT in this manner, the baby "sprung" from his chest. He said he was able to catch BT mid-waist before he hit the ground. He also told his wife he had already called the emergency room and was advised by the medical staff to watch BT and contact them if BT showed signs of worsening.

JT was still concerned, however, because BT was "breathing strange and there were no tears coming out of his eyes and he was real pale looking." She called St. Luke's Hospital where her son had been born two and one-half months earlier. The hospital's records reflect she made the call at 1112. As she was talking, the appellant interrupted JT. He told his wife that BT's heartbeat had stopped at a certain point prior to his wife's return. This news caused JT to become enormously upset. After calming down and informing the hospital staff member of this new information, she agreed to bring the baby to the nearest emergency room, which happened to be the on-base medical facility. The appellant resisted the idea of going, but after arguing with his wife about it for 15 minutes, he agreed to go.

Before heading to the hospital, JT began changing BT's clothes and diaper. As she started to change BT, the appellant interjected by saying, "before you take the jammies off, you are going to see something, and don't freak out when you see it.... There are bruises up and down [BT's] side. Don't freak out when you see them." He told his wife that he did not realize he had bruised BT that badly when he caught him. JT testified that BT's body had two sets of bruises at this point in time. The first set of bruises included thumb marks on BT's back and finger marks on the front of his abdomen. This set of bruises was wider and longer than her own fingers. The second set appeared to be palm prints between BT's shoulder blades.

At the on-base emergency room, the appellant repeated his explanation as to how the bruises occurred. Health care providers examined BT and concluded the baby's condition simply warranted at-home observation. JT was not satisfied with this medical advice, and at one point she asked whether BT's

---

1. Although the appellant's wife and son had a different last name from his, the couple was married at the time of BT's birth and at the time of the assault. The couple had divorced, however, by the time of trial.

injuries and symptoms were consistent with the appellant's description of dropping the baby while ironing and catching him mid-air. She was advised it was possible, but JT still insisted on getting a second opinion at the hospital where BT was born. She was unsuccessful in getting a referral.

Six days later on 28 August 2000, JT took the baby to a routine checkup at the on-base medical facility. The examining physician expressed some concerns about the child's appearance and ordered additional testing for the next day in Boise. The appellant accompanied his wife and son to this appointment in Boise. The tests revealed BT had spots of bleeding on his brain, and the child was admitted for further evaluation. When JT told the appellant his son was being admitted into the hospital for bleeding on the brain, he repeatedly said, "This is fucking bullshit."

Agents from the Air Force Office of Special Investigations came to the Boise hospital and interviewed the appellant. He provided verbal and written statements about the events of 22 August. He told the agents he had felt stressed out over his meeting with his commander. While his wife was gone, BT was sitting in a chair on the floor and started to cry. He admitted he went over to the chair and "quite aggressively" pulled BT out of the chair by his mid-section and brought him to his shoulder. He told the agents the baby's chin hit his shoulder, causing the baby's head to tilt back. He described the baby's reaction as "surprised." He said he then changed BT's clothes and diaper, but did not notice any bruising. He told agents he then went back to unplug the iron and was holding BT on his left forearm face down when BT kicked off his chest and started to fall. The appellant said he dropped the iron and caught BT about the abdomen. In his written statement, the appellant concluded that his "actions in pulling [the baby] aggressively against my chest is [sic] probably the reason he sustained the bruising inside his head" and "what gave him the bruises on his abdomin[sic]." He specifically denied shaking BT.

The appellant told his wife a similar version of events that evening in their bedroom.

He got on his knees and said, "I have not been completely honest with you." He went on to describe how BT was in his "bouncy chair" and crying and there came a point when he "couldn't take the crying no more. So I took him in one big swipe to my shoulder." He said that this grabbing motion was in addition to catching BT in mid-air when BT "sprung" from his arms.

The appellant made an additional statement to a co-worker in the fall of 2000. The co-worker noticed that the appellant appeared to have a lot on his mind, so he asked the appellant if there was anything that he wanted to talk about. The appellant told him that his son had injuries consistent with shaking a baby. The appellant told his co-worker the injuries were caused when he went over to a couch to pick up BT and the baby squirmed out of his arms, falling to the couch and hitting the floor.

Even though the appellant admitted to having likely caused BT's abdominal bruising and brain injuries, his explanations as to how these injuries occurred did not match up with the medical evidence. This came from the testimony of Dr. (Lt Col) Stephen Boos, an Air Force medical consultant on child abuse and neglect who testified on behalf of the government.

Dr. Boos testified at length as to the nature of BT's injuries. He said that in addition to the external bruises on BT's torso identified on 22 August 2000 and still visible on 28 August 2000, BT had mild retinal hemorrhaging in his right eye. He testified that the most common cause of retinal hemorrhaging in children is trauma, usually through vigorous shaking back and forth or when the child's head is struck and swung violently to the side.

Additionally, Dr. Boos said BT had three subdural hematomas, collections of blood found in the dura of the brain, or more simply, bruising of the brain. He described at length how various CT scans and MRI tests taken on 29 and 30 August and 8 September revealed the age of these three hematomas. Thus, this testimony was important in establishing the timing of the injuries.

Dr. Boos said subdural hematomas can be classified as acute (less than seven days old), sub-acute (between 7 and 21 days old), or chronic (greater than 21 days old). Dr. Boos said BT had one "chronic" hematoma that was spread extensively over the front and top of BT's head.[2] In addition, Dr. Boos said BT had two "acute" subdural hematomas. The first was a globular oval collection of blood on the top right of BT's head, behind where the soft spot would be. The second acute subdural hematoma was farther down on the rear of BT's head, on the right side of the cerebellum. These two acute subdural hematomas were referred to as the "new bleeds" and were the primary evidence used to establish the assault on 22 August, the day BT first exhibited bruising and other signs of physical distress.

Dr. Boos testified it was possible, albeit highly unlikely, BT's injuries were caused when the appellant aggressively grabbed BT such that BT's chin struck the appellant's shoulder. Dr. Boos further testified that it was possible, but extremely unlikely, BT could have fallen a short distance and sustained the injuries he did. In Dr. Boos's opinion, the cause of BTs injuries was either "extremely vigorous shaking" or a sudden deceleration of BT's head from a velocity faster than he would have been traveling had he fallen ten feet. Dr. Boos elaborated by stating, "You don't have to fall 10 feet and strike, but you have to have that level of acceleration." Because such a deceleration would have involved a hard surface and because BT showed no outward signs of such an impact, Dr. Boos concluded that BT's brain and eye injuries occurred due to shaking alone or a combination of shaking and impact. Compared to children who had similar injuries, he characterized BT's injuries as "on the milder end of the spectrum."

## II. Defense Expert Consultant

Prior to referral of charges, the government anticipated the defense's need for an expert consultant and identified Dr. (Lt Col) Susan Brown as someone with the requisite qualifications to assist them. On 15 March 2001, the government submitted its proposal to the defense by e-mail.

The defense, however, focused on a civilian expert, Dr. Wilbur Smith, a pediatric radiologist. The following day, the defense submitted an official memorandum to the convening authority asking him to appoint Dr. Smith as a consultant and "possible witness." The defense also sent a follow-up memorandum to the convening authority on 26 March. This memorandum included the resumes of Dr. Boos, Dr. Brown, and Dr. Smith.

On 3 April, the convening authority appointed Dr. Brown as the defense's expert consultant. The appellant then filed a motion with the military judge on 17 April asking that Dr. Smith be appointed as a "new confidential defense expert consultant and potential witness." The defense counsel grounded their motion for appropriate relief on the basis that Dr. Brown (1) was not qualified, (2) was not an "adequate substitute" for Dr. Smith, (3) could not advise or testify to divergent scientific theories, and (4) would be unavailable the two weeks preceding trial. In support of the motion, the defense submitted an affidavit from Dr. Brown stating she was "competent in this area of child abuse, specifically Shaken Baby Syndrome, [but] I am not the equivalent of Dr. Stephen Boos. There are other physicians who are better qualified than me when it comes to 'Shaken Baby' cases." She also indicated that she would be unavailable for the two weeks immediately preceding the trial.

Initially, the military judge granted the defense motion based solely on Dr. Brown's lack of availability, but rescinded the order almost immediately, upon request by the government, when her availability status changed. He denied the defense's request for Dr. Smith and found that Dr. Brown was competent to act as a consultant in the area of child abuse, including shaken baby syndrome.

At trial approximately one month later, the military judge asked defense counsel if they

---

2. This injury was the factual basis for the specification for which the court members acquitted

the appellant.

wanted him to reconsider the motion. The defense replied they were not asking for reconsideration and had no further evidence on the issue.

The appellant continues to complain that Dr. Brown was not competent, and now, for the first time, claims the trial counsel played an improper role in the selection of Dr. Brown as his expert consultant. We conclude otherwise.

### Discussion

At the onset, it is important to note the parties have tended to blur the distinction between an expert consultant and an expert witness. This Court in the past has urged

> trial practitioners to distinguish between a request for an expert witness and a request for an expert consultant. An expert consultant is provided to the defense as a matter of [military and constitutional] due process, in order to prepare properly for trial and otherwise assist with the defense of a case.

*United States v. Langston*, 32 M.J. 894, 896 (A.F.C.M.R.1991). In this regard, we also recognize that Rule for Courts–Martial (R.C.M.) 703(d) deals with expert *witnesses*, and does not explicitly address expert consultants or investigative assistants. The inference from case law, however, is that R.C.M. 703(d) is generally applicable to expert consultants and investigative assistants. *See, e.g., United States v. Robinson*, 39 M.J. 88, 89 (C.M.A.1994). *See also* Major Will A. Gunn, USAF, *Supplementing the Defense Team: A Primer on Requesting and Obtaining Expert Assistance*, 39 A.F. L.Rev. 143, 146 (1996).

Although the appellant clearly hoped the appointment of Dr. Smith as a consultant would lead to favorable testimony on his behalf, he has not made a proffer as to what Dr. Smith would have testified to if called as a witness or, for that matter, even suggested his counsel interviewed Dr. Smith. *See* R.C.M. 703(c)(2)(B)(i); *United States v. Rockwood*, 52 M.J. 98, 105 (1999). Consequently, we address the issues only as they relate to an expert consultant.

In *United States v. Garries*, 22 M.J. 288, 290 (C.M.A.1986), our superior court held that as a matter of "military due process," servicemembers are entitled to confidential expert assistance, regardless of indigency. To be entitled to expert assistance, the burden is on the accused to demonstrate, on the record, the "necessity" for such services. *Id.* at 291. Even upon a showing of necessity, however, an accused is not entitled to a specific expert of his or her own choosing. *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); *United States v. Burnette*, 29 M.J 473, 475 (C.M.A.1990). All that is required is that "competent" assistance be made available. *Ake*, 470 U.S. at 83, 105 S.Ct. 1087; *Burnette*, 29 M.J. at 475. In the usual case, the expert services available in the military are sufficient. *Garries*, 22 M.J. at 291.

In *United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A.1994), our superior court set forth a three-part analysis for establishing the need for expert assistance: "First, why the expert assistance is needed. Second, what would the expert assistance accomplish for the accused. Third, why is the defense counsel unable to gather and present the evidence that the expert assistant would be able to develop." Our superior court further elaborated on the third prong in *United States v. Kelly*, 39 M.J. 235, 237 (C.M.A. 1994), by holding defense counsel responsible for doing their homework. Counsel are expected "to educate themselves to attain competence in defending an issue presented in a particular case." *Id.* at 238.

Commendably, there has been no dispute in this case as to the appellant's need for some type of expert assistance. Rather, the focus of the defense challenge is on the competency of Dr. Brown.[3] We review the military judge's decision that Dr. Brown was competent to advise the defense for an abuse of discretion. *United States v. McAllister*, 55 M.J. 270, 275 (2001); *United States v. Short*, 50 M.J. 370, 373 (1999).

---

**3.** At oral argument on these issues, appellate defense counsel clarified this issue as whether Dr. Brown was competent to serve as a defense consultant, not whether the appellant was entitled to an expert who was equally or better qualified than Dr. Boos.

Dr. Brown's impressive credentials belie the appellant's averment that she had no experience and training in "shaken baby syndrome." She had practiced medicine 14 years, including a three-year pediatric internship and residency and a two-year fellowship in adolescent medicine. She had broad exposure to child abuse issues, having attended numerous courses and taught them herself. Of special note is her experience in forensic issues—she had served as an expert witness or consultant on more than 20 cases. Although none of these cases involved shaken baby syndrome, her exposure to the military justice system was considerable and relevant to her overall competency. In addition, she served as the physician representative to the Child Maltreatment Case Management Team at Wright–Patterson Air Force Base for ten years, a very significant period of time. The appellant's assertion that Dr. Brown had "no experience in infant head trauma" flies directly in the face of not only this wealth of experience in pediatrics and child abuse, but also her sworn affidavit, wherein she stated she believed herself competent in the area of shaken baby syndrome. Indeed, her resume indicates she was a *regional* consultant on child abuse issues for the Air Force.

The appellant also attacks Dr. Brown's competency on another basis. The trial defense counsel's motion for appropriate relief averred that based upon a discussion they had with Dr. Brown on 14 April, it was their belief she would merely "defer" to Dr. Boos's opinions and conclusions. Without any additional elaboration, the appellant continues to pursue this theory of relief on appeal. Given the appellant's failure to explain the specific concerns the defense team had with Dr. Brown, it is impossible to tell whether the word "defer" is intended to suggest that Dr. Brown was a "potted plant" who acquiesced to Dr. Boos's opinions, or whether she simply agreed with his conclusions.

Nothing in the record leads us to believe Dr. Brown was a "potted plant." Despite having to deal with the appellant's multiple explanations of how BT was injured, the defense counsel was successful in bringing out a number of alternative theories for BT's injuries, including: (1) pre-birth injuries re-sulting from three falls JT had while pregnant; (2) birth injuries as reflected by BT's bruised and swollen appearance at delivery; (3) simple negligence because of the possibility BT was a "unique[,] vulnerable, [and] fragile" infant due to his premature birth and unusually shaped head; and (4) the possibility JT was the culprit because she was the primary caregiver and had greater access to the child.

Moreover, an expert consultant's competence is not diminished just because the consultant holds an opinion unfavorable to the appellant. An accused is entitled to a competent consultant, not to one who would reach a specific conclusion. A consultant supplements the defense team, *Gonzalez,* 39 M.J. at 461, and as such, has a cloak of confidentiality that allows—indeed requires—candid, honest advice. *See* Mil. R. Evid. 502(b)(3).

Having concluded that the military judge did not abuse his discretion when he determined Dr. Brown was competent to assist the defense, we turn now to the related, but distinct, issue of whether the appellant met his burden of establishing the need for Dr. Smith. We hold the military judge did not abuse his discretion because the appellant has never established what exactly Dr. Smith could do for the defense that Dr. Brown could not.

"[I]t is not enough to state that an expert would be of great assistance." *Kelly,* 39 M.J. at 237. *See Caldwell v. Mississippi,* 472 U.S. 320, 323, n. 1, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The defense is "required to make an initial showing of a particular need for the expert." *Kelly,* 39 M.J. at 237. The defense "must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." *Id.* (citations and internal punctuation omitted).

To make a proper showing of necessity, counsel must provide sufficiently detailed information to establish a nexus between the facts and circumstances of the case and the need for a particular expert. This might involve: (1) an explanation of the nature of

the government's case and the evidence linking the accused to the crime and how an expert consultant can establish weaknesses in those links; (2) an explanation of how expert assistance would impeach or cast doubt on the government's case through cross-examination; or (3) a discussion of how an expert supports a specific defense theory. *See United States v. Allen,* 31 M.J. 572, 623–24 (N.M.C.M.R.1990). While establishing the need for a particular expert consultant may require an accused to reveal his or her theory of the case and lose the element of surprise, counsel must weigh these factors against all others in making the decision on whether to request additional expert assistance. *See* Gunn, *supra,* at 144. To receive the benefits of expert assistance, an accused cannot play coy; the underlying rationale for expert assistance must be fully developed.

▮ The appellant's failure to establish necessity was especially lacking as to the third prong of the *Gonzalez* test: Why was the defense team unable to gather and present the necessary evidence on its own? A mere averment that self-study efforts have failed is not sufficient in most instances. The burden is on an accused to show the defense team took reasonably diligent steps to become educated, but was unsuccessful. This would include reading current literature, talking with witnesses, and pursuing available government resources.

The military judge, in approving Dr. Brown, provided the defense a tool to establish the relevance and necessity for someone with better or different credentials. Her expertise conceivably could have been directed toward developing a trial strategy that established the need for any number of possible experts, including a radiologist, ophthalmologist, orthopedic specialist, neurologist, or biomechanical engineer. Her own expertise would have lent itself to providing the factual predicate, as outlined in the three-pronged analysis set forth in *Gonzalez,* to secure better or different expert assistance. When offered a chance to raise the issue anew at trial, the appellant declined. Thus, the final nail in the coffin occurred when the appellant failed to renew the request after the military judge invited him to do so. R.C.M. 905(c).

### III. Trial Counsel's Role in Selection of Defense Expert Consultant

We now turn to the question of whether the trial counsel's role in obtaining an expert for the defense was improper or unfair. The appellant failed to raise this issue below, and thus we review for plain error. To establish plain error, the appellant must demonstrate that there was error, that the error was obvious and substantial, and that the error materially prejudiced his substantial rights. *See generally United States v. Powell,* 49 M.J. 460, 465 (1998); Article 59(a), UCMJ, 10 U.S.C. § 859(a).

In deciding this issue, we look to R.C.M. 703(d) for guidance on how expert consultant requests should be processed. It serves as a helpful guidepost in delineating the various roles of the trial counsel, convening authority, and military judge when dealing with these requests. R.C.M. 703(d) states in part:

> When the employment at Government expense of an expert is considered necessary by a party, the party shall, in advance of employment of the expert, and with notice to the opposing party, submit a request to the convening authority to authorize the employment and to fix the compensation for the expert.... A request denied by the convening authority may be renewed before the military judge who shall determine whether the testimony of the expert is relevant and necessary, and, if so, whether the Government has provided or will provide an adequate substitute. If the military judge grants a motion for employment of an expert or finds that the Government is required to provide a substitute, the proceedings shall be abated if the Government fails to comply with the ruling....

It is also helpful to consider the analysis to R.C.M. 703(c) because it describes the role trial counsel plays in handling defense requests for ordinary or *non-expert witnesses.*

> [T]he trial counsel is responsible for the administrative aspects of production of witnesses. Thus, ... the defense submits its list of witnesses to the trial counsel so that the latter can arrange for their pro-

duction. The trial counsel stands in a position similar to a civilian clerk of court for this purpose. Because most defense requests for witnesses are uncontested, judicial economy is served by routing the list directly to the trial counsel, rather than to the military judge first. This also allows the trial counsel to consider such alternatives as offering to stipulate or take a deposition, or recommending to the convening authority that a charge be withdrawn.... Further, it allows arrangements to be made in a more timely manner, since the trial counsel is usually more readily available than the military judge. Only if there is a genuine dispute as to whether a witness must be produced is the issue presented to the military judge by way of a motion.

Drafters' Analysis, *Manual for Courts–Martial, United States (MCM)*, A21–36 (2000 ed.).

The analysis to R.C.M. 703(d) also provides pertinent guidance regarding the *convening authority's role* in approving expert witnesses:

Because funding for such employment is the responsibility of the command, not the court-martial, and because alternatives to such employment may be available, application to the convening authority is appropriate [for employment of experts]. In most cases, the military's investigative, medical, or other agencies can provide the necessary service. Therefore the convening authority should have the opportunity to make available such service as an alternative.

MCM, A21–36.

Under the facts of this case, we find no error, plain or otherwise. The record clearly reflects that the government notified the appellant it was proposing Dr. Brown as a defense expert consultant. The appellant had an opportunity to respond and did so in two memoranda addressed to the convening authority. Although the approval decision is not a model of administrative clarity in that it only approved Dr. Brown without specifically disapproving Dr. Smith, the behavior of all the parties reflects a belief that the roles of the trial counsel, convening authority, and

military judge were properly adhered to throughout the process.

Without a doubt, the trial counsel cannot engage in overreaching or tactics that place the defense at an unfair disadvantage. The appellant invites us to speculate in this regard, but we decline to do so. We find nothing in the record to suggest the trial counsel abused his administrative role as envisioned by the drafters of R.C.M. 703. Nor do we find any fundamental unfairness as it relates to the appellant's Article 46, UCMJ, 10 U.S.C. § 846, right to equal access to evidence or witnesses. Additionally, we are satisfied that the military judge made an independent review of the appellant's request. In sum, we find no error, and even if we assumed there was error, it did not materially affect a substantial right of the appellant. Article 59a, UCMJ, 10 U.S.C § 859a.

## IV. Aggravation Evidence

■ During the presentencing stage of the proceedings, the government called Dr. Boos to testify about BT's medical condition. The appellant objected to this testimony and now contends it was inadmissible under the provisions of R.C.M. 1001(b)(4) and Mil. R. Evid. 403. He further claims it was error for the judge to instruct the members that they could consider this evidence in determining a sentence. Specifically, the appellant argues that Dr. Boos's testimony concerning the significant injuries BT sustained was inconsistent with the court members' findings that the appellant did not use "a force likely to produce death or grievous bodily harm." Thus, he argues, this was improper aggravation evidence. We disagree.

Military judges have "wide discretion" in applying Mil. R. Evid. 403. *United States v. Humpherys*, 57 M.J. 83, 91 (2002). Our superior court exercises "great restraint" in reviewing military judges' Mil. R. Evid. 403 rulings if their reasoning is articulated on the record. *Id.* (citing *United States v. Harris*, 46 M.J. 221, 225 (1997)). "Military judges receive 'less deference' if, as in this case, 'they fail to articulate their balancing analysis on the record.'" *United States v. Hur-*

*sey,* 55 M.J. 34, 36 (2001) (citing *United States v. Manns,* 54 M.J. 164, 166 (2000)).

R.C.M. 1001(b)(4) states in part:

The trial counsel may present evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty. Evidence in aggravation includes, but is not limited to, evidence of financial, social, psychological, and *medical impact on or cost to any person or entity who was the victim of an offense committed by the accused.* . . .

(Emphasis added.) Our superior court has held that aggravation evidence includes "evidence which is directly related to the offense for which an accused is to be sentenced so that the circumstances surrounding that offense or its repercussions may be understood by the sentencing authority." *United States v. Gogas,* 58 M.J. 96, 98 (2003) (citing *United States v. Vickers,* 13 M.J. 403, 406 (C.M.A. 1982)).

We conclude Dr. Boos's testimony did not contradict the court members' findings. Dr. Boos's testimony was clearly limited to the lesser-included offense of assault and battery. In both the findings and sentencing portions of the trial, Dr. Boos frequently attempted to quantify the degree of force involved in BT's injuries. On multiple occasions he indicated the force used on BT was not sufficient to cause the worst sorts of injuries often associated with shaken baby syndrome. For example, at one point during presentencing, he testified that BT was never "in a near death situation or a threat for being in a prolonged coma or vegetative state" because "the amount of forces delivered [was] not enough to cause that level of damage." Thus, we find Dr. Boos's testimony in presentencing that BT's injuries were milder in comparison to other cases involving shaken baby syndrome was consistent with the court members' determination that the appellant did not use a "force likely to result in death or grievous bodily harm."

Additionally, this evidence was directly related to the appellant's actions in "shaking and grabbing" his son on 22 August 2000. BT had permanent weaknesses in his left arm and leg, in addition to developmental delays in his gross motor skills. Dr. Boos said the neurological deficits reflected in his left side weakness correlated with brain damage on the right side of BT's brain. Thus, it is significant to our analysis that the acute subdural hematomas and retinal hemorrhaging were on BT's right side. Additionally, we find it significant that one of the acute subdural hematomas was adjacent to BT's right cerebellum, the area of the brain responsible for balance and coordination.

Applying a lesser degree of deference because the military judge did not articulate his balancing analysis under Mil. R. Evid. 403, it is our considered judgment that exclusion of this evidence was not required by R.C.M. 1001(b)(4). We have performed the balancing test and find the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the members, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence. Article 66(c), UCMJ, 10 U.S.C. § 866(c); Mil. R. Evid. 403. We find the medical testimony relating to BT's injuries is entirely consistent with the court members' findings that the appellant did not use a force likely to result in death or grievous bodily harm and that this evidence is directly related to the appellant "grabbing and shaking" BT on 22 August 2000. It was not "necessarily inferable" from the verdict that the court members did not believe BT had significant injuries. *Cf. United States v. Terlep,* 57 M.J. 344, 348 (2002) (victim's sentencing testimony that she was raped by accused did not contradict a stipulation of fact indicating agreement she was assaulted). Finally, we hold that the military judge did not err in instructing the members that they should consider "the nature and extent of the injuries suffered by [BT,] to include his period of hospitalization" in determining an appropriate sentence.

## V. Sentencing Argument

The final issue for our consideration is whether the military judge erroneously restricted assistant defense counsel's sentencing argument.

The assistant defense counsel talked at some length about the appellant's youth and immaturity, especially in the context of his rocky marriage, financial stress, and distance from home. In advocating on behalf of her client, she stated, "Airman Warner needs a chance to succeed and become a productive member of society to be a good father. He wants to be able to support his son in any way he can." At this point, the prosecution objected on the basis the argument included "facts not in evidence." The military judge sustained the objection.

Counsel must limit their sentencing arguments to evidence in the record and any fair inference as may be drawn from them. *United States v. White*, 36 M.J. 306, 308 (C.M.A.1993) (citing *United States v. Nelson*, 1 M.J. 235, 239–40 (C.M.A.1975)). We review a military judge's decision on whether sentencing argument has exceeded the bounds of fair comment for an abuse of discretion. We believe a military judge should be given even broader discretion when ruling on how far defense counsel can argue matters asserted in an accused's unsworn statement. *Cf. United States v. Hopkins*, 56 M.J. 393 (2002) (a military judge has broad discretion in tailoring instructions to address an unsworn statement because such statements are not made under oath, are not subject to cross-examination, and are not subject to the normal restrictions of the rules of evidence).

Under the facts and circumstances of the present case, we hold that the judge did not abuse his broad discretion. The appellant did not clearly or directly state he desired to be a "good father." *Cf. United States v. Tschip*, 58 M.J. 275 (2003). Rather the thrust of his unsworn statement and his counsel's argument was his desire for a sentence that would allow him to "get on with his life" so he could "better himself" and those that depended upon him for support. This sentiment was fully developed in the defense counsel's sentencing argument. The trial counsel's prompt objection was an effort to foreclose the defense counsel from expanding her argument beyond what was contained in the unsworn statement.

The findings are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Reed*, 54 M.J. 37, 41 (2000). Accordingly, the approved findings and sentence are

AFFIRMED.