UNITED STATES, Appellee

v.

Anthony W. WARNER, Senior Airman
U.S. Air Force, Appellant

No. 04-0119

Crim. App. No. 34716

United States Court of Appeals for the Armed Forces

Argued November 8, 2004

Decided September 30, 2005

GIERKE, C.J., delivered the opinion of the Court, in which
EFFRON, BAKER, and ERDMANN, JJ., joined.  CRAWFORD, J. filed a
dissenting opinion.

Counsel

For Appellant:  Captain James M. Winner (argued); Colonel
Beverly B. Knott and Major Terry L. McElyea (on brief).

For Appellee:  Captain Kevin P. Stiens (argued); Colonel LeEllen
Coacher and Lieutenant Colonel Robert V. Combs (on brief).

Military Judge:  Robert. G. Gibson Jr.


**This opinion is subject to revision before final publication**.

Chief Judge GIERKE delivered the opinion of the Court.

INTRODUCTION

Article 46 of the Uniform Code of Military Justice (UCMJ) commands that the "trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence . . . ."[1]  This case involves the application of Article 46 to the designation of expert consultants to aid the opposing parties.  We hold that the Government violated Article 46 when it assigned the Air Force's premier shaken baby syndrome expert to itself, while denying the defense's request for an adequately-qualified expert and instead providing the defense with a consultant with no apparent experience in the area of shaken baby syndrome.

BACKGROUND

Appellant was tried by a general court-martial consisting of officer and enlisted members.  Appellant was charged with two specifications of aggravated assault on his infant son in violation of Article 128, UCMJ.[2]  He pleaded not guilty.  The court-martial found Appellant guilty of the lesser included offense of assault and battery as to the first specification and found him not guilty of the second.[3]

---

[1] 10 U.S.C. § 846 (2000).
[2] 10 U.S.C. § 928 (2000).
[3] The members sentenced Appellant to a bad-conduct discharge, confinement for eighteen months, forfeiture of all pay and allowances, and reduction to pay grade E-1.  The convening

The charges grew out of an incident that occurred while Appellant was caring for his son, BT, when he was seventy-seven days old. Appellant was home on the morning of August 22, 2000, preparing for a meeting with his commanding officer that could potentially lead to nonjudicial punishment. As Appellant ironed his uniform, his wife left the house to borrow five dollars from her parents so Appellant could get a haircut before the meeting. She was gone for about one hour. When Appellant's wife returned, she found BT in her husband's arms. BT's "arms and legs were slumped over. He was crying and no tears were coming out of his eyes," and he was "hardly moving at all." As the Air Force Court explained, Appellant's wife asked what happened. Appellant replied that he was holding BT "in his left arm with

---

authority approved the sentence as adjudged. The Air Force Court of Criminal Appeals affirmed. United States v. Warner, 59 M.J. 573, 583 (A.F. Ct. Crim. App. 2003). We then granted review. United States v. Warner, 60 M.J. 124 (C.A.A.F. 2004). The two granted issues were:

I. WHETHER THE MILITARY JUDGE ERRED BY DENYING APPELLANT'S MOTION FOR APPROPRIATE RELIEF SEEKING A FULLY COMPETENT EXPERT CONSULTANT.

II. WHETHER THE GOVERNMENT VIOLATED ARTICLE 46, RULE FOR COURTS-MARTIAL 703, AND THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION BY ALLOWING THE ASSISTANT TRIAL COUNSEL TO SELECT THE DEFENSE EXPERT CONSULTANT AND PROVIDE ADVERSE EX PARTE ADVICE TO THE CONVENING AUTHORITY CONCERNING THE DEFENSE REQUEST FOR AN EXPERT CONSULTANT.

Because we rule for Appellant on Issue I, we need not reach Issue II.

the baby's head facing him while he ironed with his right.  He said that while holding BT in this manner, the baby 'sprung' from his chest.  He said he was able to catch BT mid-waist before he hit the ground."[4]  Appellant told his wife that he had already called the emergency room and was advised to watch BT and call back if his condition worsened.

Appellant's wife remained concerned because BT was "breathing strange and there were no tears coming out of his eyes and he was real pale looking."  She called a civilian hospital.  While she was on the phone, Appellant interrupted her and told her that at one point while she was gone, BT's heart had stopped.  In light of this information, the civilian medical personnel advised Appellant's wife to take BT to the nearest emergency room, which was the base medical facility.  Appellant "resisted the idea of going, but after arguing with his wife about it for 15 minutes, he agreed to go."[5]  Before they left, Appellant's wife started to change BT's clothes and diaper.  Appellant told her, "[B]efore you take the jammies off, you are going to see something, and don't freak out when you see it . . . .  There are bruises up and down [BT's] side.  Don't freak out when you see them."

At the emergency room, Appellant "repeated his explanation

_____

[4] Warner, 59 M.J. at 575.
[5] Id.

4

as to how the bruises occurred. Health care providers examined BT and concluded the baby's condition simply warranted at-home observation."[6]

Six days later, Appellant's wife took BT "to a routine checkup at the on-base medical facility. The examining physician expressed some concerns about the child's appearance and ordered additional testing . . . . The tests revealed BT had spots of bleeding on his brain, and the child was admitted for further evaluation."[7]

Air Force Office of Special Investigations agents then interviewed Appellant, who "provided verbal and written statements."[8]

> [Appellant] told the agents he had felt stressed out over his meeting with his commander. While his wife was gone, BT was sitting in a chair on the floor and started to cry. He admitted he went over to the chair and "quite aggressively" pulled BT out of the chair by his mid-section and brought him to his shoulder. He told the agents the baby's chin hit his shoulder, causing the baby's head to tilt back. He described the baby's reaction as "surprised." He said he then changed BT's clothes and diaper, but did not notice any bruising. He told agents he then went back to unplug the iron and was holding BT on his left forearm face down when BT kicked off his chest and started to fall. The appellant said he dropped the iron and caught BT about the abdomen. In his written statement, the appellant concluded that his "actions in pulling [the baby] aggressively against my chest is [sic] probably the reason he sustained the bruising inside his head" and "what gave him the bruises on his abdomin [sic]." He specifically denied shaking BT.

---

[6] Id.
[7] Id. at 576.
[8] Id.

The appellant told his wife a similar version of events that evening in their bedroom. He got on his knees and said, "I have not been completely honest with you." He went on to describe how BT was in his "bouncy chair" and crying and there came a point when he "couldn't take the crying no more. So I took him in one big swipe to my shoulder." He said that this grabbing motion was in addition to catching BT in mid-air when BT "sprung" from his arms.

The appellant made an additional statement to a co-worker in the fall of 2000. . . . The appellant [said] that his son had injuries consistent with shaking a baby. The appellant told his co-worker the injuries were caused when he went over to a couch to pick up BT and the baby squirmed out of his arms, falling to the couch and hitting the floor.[9]

Before the charges against Appellant were referred to the general court-martial, the trial counsel obtained Lieutenant Colonel (Dr.) Stephen Boos as a Government expert assistant. Dr. Boos was an Air Force pediatrician with considerable experience concerning shaken baby syndrome. In the words of the trial counsel's opening statement, Dr. Boos "is the only fellowship-trained expert on child abuse in the Air Force, and one of the few fellowship-trained experts in the United States."

Also before referral, Dr. Boos recommended to the trial counsel that another Air Force physician, Lieutenant Colonel (Dr.) Susan Brown, be appointed as the defense's expert consultant. On March 15, 2001, the day before charges were referred, the trial counsel sent an e-mail to the defense counsel proposing Dr. Brown's appointment as a defense expert.

---

[9] Id.

The following day, charges were referred and the defense asked the convening authority to fund the appointment of Dr. Wilbur Smith, a civilian pediatric radiologist, as a defense expert consultant.[10] The defense request noted that the Government had sought to provide Dr. Brown to the defense. The defense opposed that suggestion, observing that Dr. Boos had more extensive experience concerning "infant physical abuse (e.g., 'shaken baby syndrome') compared to Dr. Brown." Dr. Brown specialized in adolescents.

Before appointing an expert consultant for the defense, the convening authority received several documents concerning the defense request that were neither attached to the record nor revealed to the defense. While these documents were not attached to the record and the Air Force Court denied a defense motion for their production, they apparently included a memorandum from the trial counsel to the convening authority recommending denial of the defense request for Dr. Smith.

Despite the defense's request for a different expert, the convening authority appointed Dr. Brown as the defense expert.

In a pretrial motion, the defense asked the military judge to order the convening authority to appoint the defense's

---

[10] As this request to the convening authority and the later litigation before the military judge demonstrate, the dissent is incorrect when it asserts, "[t]he defense made no request for any expert witness." United States v. Warner, __ M.J. __, __ (24)(C.A.A.F. 2005)(Crawford, J., dissenting).

preferred expert consultant instead. The motion expressly relied on, among other authorities, Article 46's guarantee that the Government and the defense shall have equal opportunity to obtain witnesses and other evidence. The defense submitted a supporting affidavit from Dr. Brown. The affidavit stated that "[i]n the area of child abuse, I have the most direct clinical experience with child sexual abuse. I have not, however, been a consultant or witness at trial for Shaken Baby Syndrome." Dr. Brown added that while she felt "competent in this area of child abuse, specifically, Shaken Baby Syndrome, I am not the equivalent of Dr. Stephen Boos. There are other physicians who are better qualified than me when it comes to 'Shaken Baby' cases." The motion also averred that based on the defense counsel's conversations with Dr. Brown, the defense counsel believed she would merely "defer" to the opinions of Dr. Boos, the Government expert. The motion specifically alleged that while Dr. Brown "is able to advise the [d]efense generally on the timing of the injuries," she could not advise the defense concerning "possible alternative explanations." These averments are contained in the defense motion's fact section. In his original ruling on the motion, the military judge's "findings" included the following: "For purposes of this motion, the defense statement of facts is accepted."[11]

---

[11] A curious aspect of this case is the disagreement between the

The military judge did not order the appointment of the requested civilian defense expert, but, due to Dr. Brown's unavailability on the scheduled trial date, ordered the convening authority to appoint a replacement expert.  A short time later, when Dr. Brown's schedule changed to eliminate the conflict, the Government sought reconsideration of the military judge's order.  The military judge then rescinded his previous order and found that Dr. Brown was competent to serve as the defense's shaken baby syndrome consultant.

---

majority and the dissenter as to the factual predicate relating to Issue I.  This disagreement reaffirms the wisdom of Senior Judge Everett in reminding everyone involved in a military justice case (litigants, judges, and staff judge advocates) of the primary task to preserve the facts when he said, "'Always salt down [preserve] the facts first; the law will keep.'" United States v. Haney, 45 M.J. 447, 448 (C.A.A.F. 1996)(quoting Erickson v. Starling, 235 N.C. 643, 71 S.E. 2d 384, 395-96 (N.C. 1952)).  In the present case, it is the view of the majority that the operative facts were preserved by the military judge expressly adopting the defense's statement of facts in the military judge's own findings.  We therefore disagree with the dissent when it alleges that these facts of record are "not before this Court as anything other than unsupported argument . . . 'averred' in written pretrial motions. . . ."  Warner, __ M.J. at __ (20)(Crawford, J., dissenting); see also id. at 4, 11, 27-28.  It is the majority view that the military judge's order on the Government's reconsideration motion rescinded the earlier order, but that did not obligate the defense to reprove matters that the military judge had previously found as fact. The military judge rescinding the earlier order did not wipe clean the factual slate in the record of the defense request for expert assistance.  To hold otherwise would be remarkably cumulative and problematic, as it would require a potentially lengthy evidentiary hearing to reprove facts that the military judge had already expressly adopted as the operative facts for the defense request for expert assistance.

9

Dr. Boos testified as a Government witness at trial. Neither Dr. Brown nor any other medical expert testified for the defense. At the conclusion of the fully contested trial, the members found Appellant not guilty of one of the aggravated assault specifications and, as to the other, guilty of the lesser included offense of assault and battery on a child under sixteen.

## DISCUSSION

A. Article 46

This case involves a violation of both the letter and the spirit of Article 46. Under Article 46, the defense's "opportunity to obtain witnesses and other evidence" is to be equal to the Government's. But in this case, the Government had already secured its expert witness before the defense had an opportunity to seek its own. The Government exploited this advantage by securing one of the Air Force's preeminent experts concerning shaken baby syndrome as its own witness.

Article 46 deals with the "opportunity to obtain witnesses and other evidence." While the defense request in this case was for an expert consultant rather than an expert witness,[12] Article 46 is still applicable. One important role of expert

_____

[12] See generally United States v. Langston, 32 M.J. 894 (A.F.C.M.R. 1991) (discussing distinction between expert consultants and expert witnesses).

consultants is to help counsel develop evidence.[13]  Even if the
defense-requested expert consultant would not have become an
expert witness, he would have assisted the defense in
evaluating, identifying, and developing evidence.  Another
important function of defense experts is to test and challenge
the Government's case.  The denial of a defense expert with
professional qualifications reasonably comparable to those of
the Government's expert interfered with this function.

We have held that "[a]n accused is entitled to expert
assistance provided by the Government if he can demonstrate
necessity."[14]  As the lower court observed, "there has been no
dispute in this case as to the appellant's need for some type of
expert assistance."[15]  Rather, the issue in this case is whether
the expert the Government provided to the defense was an
adequate substitute for the defense-requested civilian expert.

Of course, neither the convening authority nor the military
judge was required to provide the defense with the particular
expert it requested.[16]  But because expert assistance was

---

[13] See Janet Weinstein, Coming of Age:  Recognizing the
Importance of Interdisciplinary Education in Law Practice, 74
Wash. L. Rev. 319, 325 (1999).
[14] United States v. Gunkle, 55 M.J. 26, 31 (C.A.A.F. 2001).
[15] Warner, 59 M.J. at 578.
[16] United States v. Calhoun, 49 M.J. 485, 487-88 (C.A.A.F. 1998).

11

necessary for the defense, the Government could deny the requested expert only if it provided an "adequate substitute."[17]

Expert assistants are frequently detailed to the parties litigating contested courts-martial. And "[w]ith the rapid growth of forensic science techniques, it has become increasingly apparent that complex cases require more than general practitioners."[18] The trial counsel appeared to recognize that reality by securing a leading shaken baby syndrome expert for the prosecution team. Yet a generalist with no apparent expertise in that specific area was assigned as the defense consultant.

In affirming the military judge's ruling, the Air Force Court wrote that "Dr. Brown's impressive credentials belie the appellant's averment that she had no experience and training in 'shaken baby syndrome.'"[19] Yet neither the Air Force Court nor the dissent has identified anything in the record demonstrating that Dr. Brown had any experience in the area of shaken baby syndrome.[20] On the contrary, the Air Force Court explicitly

---

[17] United States v. Ford, 51 M.J. 445, 455 (C.A.A.F. 1999)(quoting Rule for Courts-Martial 703(d))(quotation marks omitted).
[18] United States v. McAllister, 55 M.J. 270, 275 (C.A.A.F. 2001).
[19] Warner, 59 M.J. at 579.
[20] The dissent takes issue with our statement that nothing in the record demonstrates that Dr. Brown had experience in the area of shaken baby syndrome. Warner, __ M.J. at __ (20-21) (Crawford, J., dissenting). But the dissent argues to the contrary by relying on Dr. Brown's affidavit, which does not claim any experience in the area of shaken baby syndrome. The affidavit

12

acknowledged that none of the previous military justice cases on which Dr. Brown worked "involved shaken baby syndrome."[21] The Government similarly argues that Dr. Brown was "an expert with impressive credentials," but offers no credentials or experience concerning shaken baby syndrome -- the area of expertise relevant to this case and an area in which the Government expert specialized. This failure is particularly striking because it was the Government who proposed and obtained Dr. Brown as a defense expert. The Government would seem to be well positioned to call attention to any special expertise that Dr. Brown had in this area, yet the Government has not done so. Nor have we found any indication in the record that Dr. Brown had any experience dealing with shaken baby syndrome.

The Government, however, argues that it was sufficient to provide a generalist to the defense. Quoting our opinion in United States v. Short, the Government argues, "All that is required is that competent assistance be made available."[22] That quotation originates from our decision in United States v.

---

merely reflects that Dr. Brown "feel[s] competent in this area of child abuse." But that belief could have been based upon the availability of treatises on the subject unaccompanied by actual training. It neither claims nor demonstrates that Dr. Brown has experience in this area. We also take this opportunity to emphasize that this opinion implies no criticism of Dr. Brown. There is no reason to doubt that she performed her duties conscientiously. But, as she herself acknowledged, her qualifications in this area were not reasonably equivalent to Dr. Boos's.

[21] Id.

Burnette,[23] where it was immediately followed by a citation to the Supreme Court's opinion in Ake v. Oklahoma.[24]  Ake is, of course, a civilian case based on the "Fourteenth Amendment's due process guarantee of fundamental fairness."[25]  The Court applied that fundamental fairness guarantee to require that

> when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.[26]

The Court then cautioned, "This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own."[27]  So the legal issue in Short, Burnette, and Ake was distinct from the issue in this case, which concerns Article 46. Providing the defense with a "competent" expert satisfies the Government's due process obligations, but may nevertheless be insufficient to satisfy Article 46 if the Government's expert concerning the same subject matter area has vastly superior qualifications.

Given the facts of this case, Article 46 requires that an "adequate substitute" for Dr. Smith have qualifications

---

[22] 50 M.J. 370, 373 (C.A.A.F. 1999).
[23] 29 M.J. 473, 475 (C.M.A. 1990).
[24] 470 U.S. 68 (1985).
[25] Id. at 76.
[26] Id. at 83.

reasonably similar to those of the Government's expert, Dr. Boos. Indeed this "adequate substitute" standard is stated in Rule for Courts-Martial (R.C.M.) 703(d). The absence of such parity opens the military justice system to abuse, because the Government in general, and -- as this case demonstrates -- the trial counsel in particular, may play key roles in securing defense experts. Appellant's brief analogizes this situation to "permitting a Major League baseball manager to choose the opposing pitcher in the final game of the World Series." Article 46 is a clear statement of congressional intent against Government exploitation of its opportunity to obtain an expert vastly superior to the defense's. Requiring that an "adequate substitute" for a defense-requested expert have professional qualifications at least reasonably comparable to those of the Government's expert is a means to carry out that intent where the defense seeks an expert dealing with subject matter similar to a Government expert's area of expertise and where the defense expert is otherwise adequate for the requested purpose.

Under the approach of the lower court and the dissent, the prosecution would always be free to secure preeminent experts for itself while detailing minimally competent experts to the defense. Article 46 reveals that Congress intended a more even playing field.

---

[27] Id.

There is no litmus test standard for determining whether a substitute for a defense-requested expert is adequate.  Rather, this is a fact-intensive determination that is committed to the military judge's sound discretion.  In this case, the substitute clearly did not meet this standard.

The relevant area of expertise in this case concerned whether injuries to a seventy-seven-day-old baby had been caused by shaking.  The Government's expert was a pediatrician with extensive experience and training in the specific area of shaken baby syndrome.  The trial counsel exploited the Government expert's credentials by telling the members that he "is the only fellowship-trained expert on child abuse in the Air Force, and one of the few fellowship-trained experts in the United States."  The defense expert, on the other hand, specialized in adolescents -- an area of specialization obviously far less relevant to determining the cause of the seventy-seven-day-old victim's injuries.  She had no apparent experience with shaken baby cases.

In rejecting the defense's challenge to the proffered substitute expert, neither the military judge nor the Air Force Court considered the necessity to ensure that the "adequate substitute" offered by the Government had professional qualifications reasonably comparable to those of the Government's expert.  Both of those rulings constituted an abuse

16

of discretion because they were influenced by an erroneous view of the law.[28]  The military judge erred by denying the defense's motion for a more qualified expert assistant.  We do not hold that the military judge was required to make Dr. Smith available to the defense.  Rather, we hold that the defense was entitled to an expert who could adequately substitute for Dr. Smith and who had qualifications reasonably comparable to those of the Government expert who testified in the same subject area.  Dr. Brown did not satisfy that requirement.

The dissent complains that our holding is "completely unsupported by any citation to supporting authority."[29]  On the contrary, our holding cites, and rests on, the plain wording of Article 46.  That plain language is the best source for discovering Congress's intent.[30]

---

[28] See United States v. Sullivan, 42 M.J. 360, 363 (C.A.A.F. 1995) (an appellate court "will reverse for an abuse of discretion if the military judge's findings of fact are clearly erroneous or if his decision is influenced by an erroneous view of the law").

[29] Warner, __ M.J. at __ (15)(Crawford, J., dissenting).

[30] See, e.g., Lamie v. United States Trustee, 540 U.S. 526, 536 (2004) ("We should prefer the plain meaning since that approach respects the words of Congress.  In this manner we avoid the pitfalls that plague too quick a turn to the more controversial realm of legislative history."); INS v. Cardoza-Fonseca, 480 U.S. 421, 433 n.12 (1987) (noting "the strong presumption that Congress expresses its intent through the language it chooses")(citations and quotation marks omitted).  The dissent objects that we do not cite any case law supporting our interpretation of Article 46.  Warner, __ M.J. at __ (15) (Crawford, J., dissenting).  But case law must comport with Article 46, not vice versa.  Moreover, this appears to be an issue of first impression.  We must turn to the primary source

The dissent's discussion of the Sixth Amendment is inapposite. Congress was free to, and did, adopt a more protective statutory system for military accused than the Constitution provides for civilians in a criminal trial.[31] Nor is it surprising that an analysis of Article 46 might yield results different from those suggested by the Sixth Amendment, federal statutes, or the Federal Rules of Criminal Procedure, because the language in those authorities differs from that of Article 46.

Additionally, in construing Article 46, we cannot simply defer to the rules contained within the Manual for Courts-Martial (MCM). As a congressional statute, Article 46 prevails

---

of the statute, rather than case law, to resolve it. Finally, while we need not rely on case law to support our interpretation of Article 46's plain language, we note that the dissent cites no case law inconsistent with today's holding. The dissent cites four cases that it contends this case "implicitly modifies." Id. at __ (3-4 n.7). Three of the four cases do not even cite Article 46. United States v. Gonzalez, 39 M.J. 459 (C.A.A.F. 1994); United States v. Ndanyi, 45 M.J. 315 (C.A.A.F. 1996); Ford, 51 M.J. 445. The fourth, United States v. Garries, 22 M.J. 288 (C.M.A. 1986), concerned a military judge's denial of a defense motion for $1,500 for investigative assistance after the defense had already been offered, and declined, the services of an Air Force investigator operating under an order of confidentiality. There is no inconsistency between those opinions and this case.

[31] "In defining the rights of military personnel, Congress was not limited to the minimum requirements established by the Constitution, and in many instances, it has provided safeguards unparalleled in the civilian sector." United States v. Mapes, 59 M.J. 60, 65 (C.A.A.F. 2003) (quoting United States v. McGraner, 13 M.J. 408, 414 (C.M.A. 1982)(quotation marks omitted)); see, e.g., Francis A. Gilligan, The Bill of Rights

over any limiting interpretation of an MCM provision.[32] To the extent that Article 46 provides rights beyond those contained within R.C.M. 703, it is our judicial duty to enforce the statutorily-established rights.

This opinion applies the plain meaning of a congressional statute to the facts of this case. That task is the very essence of judging. We are not applying a principle today that did not exist when this case was tried. Article 46 was enacted in 1950.[33] Had the military judge applied the plain meaning of Article 46, he would have recognized that Dr. Brown was not sufficiently qualified to adequately serve as a substitute expert in light of the prosecution's retention of Dr. Boos as its expert.

Finally, the dissent questions Dr. Smith's expertise in an apparent attempt to suggest that Dr. Brown was no less qualified than Dr. Smith, so Dr. Brown was an adequate substitute.[34] But as the record establishes and other appellate courts have found, Dr. Smith is a recognized expert in the area of shaken baby syndrome.

---

and Service Members, 1987 Army Law. 3, 10 (Dec. 1987) (servicemembers' rights broader than constitutionally required).
[32] See, e.g., United States v. Swift, 53 M.J. 439, 451 (C.A.A.F. 2000).
[33] Act of May 5, 1950, ch. 169, § 1 (Article 46), 64 Stat. 122 (current version codified at 10 U.S.C. § 846 (2000)).
[34] Warner, __ M.J. at __ (12) (Crawford, J., dissenting).

As his curriculum vitae demonstrates, Dr. Smith had both published and lectured in the specific area of shaken baby syndrome, as well as such relevant areas as diagnosing head injuries, head injuries in child abuse, imaging in child abuse, and pediatric imaging.

The statement of facts in Appellant's motion, which the military judge's original findings expressly accepted, also establishes that Dr. Smith "has extensive experience in diagnosing head trauma in infants.  He has the training and experience in evaluating cases like [BT's]."

Given Dr. Smith's impressive credentials, it is not surprising that in cases dealing with shaken baby syndrome, the Air Force Court of Criminal Appeals, the Missouri Court of Appeals, and Justice Toal of the South Carolina Supreme Court have noted his expertise.[35]  Like Dr. Boos, Dr. Smith was clearly

---

[35] See United States v. Stanley, 60 M.J. 622, 625 (A.F. Ct. Crim. App. 2004) ("Dr. Wilbur Smith, an expert in radiology and SBS [Shaken Baby Syndrome], also testified."); United States v. White, No. ACM 31474, 1996 CCA LEXIS 212, at *3-*4 (A.F. Ct. Crim. App. July 12, 1996) ("Doctor Wilbur L. Smith, Professor of Pediatrics and Radiology, University of Iowa, a recognized expert in child abuse, testified that shaken baby syndrome is a syndrome in which an infant is shaken violently to and fro with such force that the acceleration and deceleration and gravitational forces cause significant brain injury."); State v. Candela, 929 S.W.2d 852, 860 (Mo. Ct. App. 1996) ("Dr. Smith and Dr. Alexander, experts on shaken infant syndrome, testified after Dr. Case."); State v. Cutro, 504 S.E.2d 324, 331 (S.C. 1998) (Toal, J., dissenting) ("Dr. Wilbur Smith, Jr. also testified.  As an expert in pediatric radiology and child abuse, he was, at the time of the trial, one of only 30 or fewer physicians in the country who were exam-certified in the field.

a highly qualified expert in the field of shaken baby syndrome.

Dr. Brown was not an adequate substitute.[36]

   B.  Prejudice

   In this case, the nature of the legal error -- the denial

of a sufficiently qualified expert -- interferes with

Appellant's ability to demonstrate prejudice.  The Army Court of

Criminal Appeals has recently referred to this situation as "a

classic military defense counsel dilemma."[37]  The Army Court

explained:

> The best way to articulate and explain the need for an
> expert is by using just such an expert to describe
> their evidence analysis and development process.  But
> experts, when not already employed by the government,
> charge fees for their services, and detailed defense
> counsel normally do not have access to money to pay
> for such initial services, in order to obtain
> preliminary consultation or evaluation services.[38]

   This "military defense counsel dilemma" also explains why

the defense never requested Dr. Smith as an expert witness.

Until the defense had obtained the funds to consult with Dr.

Smith, it was unable to determine whether his testimony would

_____

He stated that because of the evidence of the retinal
hemorrhages, the subdural hematomas, and subarachnoid
hemorrhages, 'there is no question [that] there is no other
medical diagnosis' than shaken baby syndrome.").
[36] We observe that not only does the record fail to establish Dr.
Brown as an expert with experience in shaken baby syndrome, but
we have not identified any other appellate court that has either
recognized or relied on her as an expert in this area.
[37] United States v. Kreutzer, 59 M.J. 773, 777 n.4 (A. Ct. Crim.
App. 2004), aff'd, 61 M.J. 293 (C.A.A.F. 2005).
[38] Id.

have been helpful or harmful. Consulting with an expert will often be a necessary precondition to establishing the expert's necessity as a witness. But in this case, the defense never had an opportunity to consult with Dr. Smith or a substitute expert with professional qualifications reasonably comparable to Dr. Boos's. The Government, on the other hand, labors under no similar burden to demonstrate necessity before securing its own experts.

We will not adopt a prejudice standard that functions as a self-defeating Catch-22.[39] Rather, we will presume prejudice in this case where: (1) the Government denied the defense's request for an expert and instead provided the defense with a substitute expert of its choice; (2) the Government had obtained an expert in the same subject matter area for itself; (3) the defense challenged the relative qualifications of the substitute expert; (4) the military judge denied a defense motion seeking an order requiring the originally-requested expert to be detailed to the case; and (5) the substitute expert provided by the Government was not adequate because her professional qualifications concerning shaken baby syndrome were not

---

[39] Catch-22 is defined as a "problematic situation for which the only solution is denied by a circumstance inherent in the problem or by a rule." Webster's Ninth New Collegiate Dictionary 215 (9th ed. 1991). The origin of the phrase is found in the novel Catch-22 (1961) by Joseph Heller. Id.

22

reasonably comparable to those of the Government's expert.[40]

While the Government can attempt to overcome that presumption of prejudice, it has not done so here. The specification of which Appellant was convicted, as excepted by the members, alleged that on or about August 22, 2000, Appellant assaulted BT "by grabbing and shaking him with his hands." That conviction may well have been influenced by Dr. Boos's extensive testimony, during which he opined that BT's "injuries appear to have occurred from either extremely vigorous shaking, severe shaking beyond what you would expect to do to a normal baby, something that people would recognize as potentially harmful or from [BT] having his head suddenly decelerated probably by being swung against a surface." The military judge's erroneous denial of the defense motion for a more qualified expert consultant left the defense without the adequate tools to analyze and possibly challenge or rebut that opinion. Accordingly, the members' finding that Appellant committed an assault and battery must be reversed.

DECISION

The decision of the United States Air Force Court of Criminal Appeals is reversed. The findings of guilty and the

---

[40] By listing these factors that were present in this case, we do not mean to imply that all must be present to warrant a presumption of prejudice where the Government has violated Article 46.

sentence are set aside.  The record of trial is returned to the Judge Advocate General of the Air Force.  A rehearing on the findings and the sentence is authorized.

United States v. Warner, 04-0119/AF

CRAWFORD, Judge (dissenting):

I cannot embrace the view of the law, the facts, or the role of this Court that inheres in the majority's conclusions. Consequently, I must respectfully, but emphatically dissent.

LAW

When enacted in 1950, Article 46, Uniform Code of Military Justice (UCMJ),[1] provided, as it does today:

> The trial counsel, [the] defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe.  Process issued in court-martial cases to compel witnesses to appear and testify and to compel the production of other evidence shall be similar to that which courts of the United States having criminal jurisdiction may lawfully issue and shall run to any part of the United States, its Territories, [Commonwealths,] and possessions.

Quoting only the first clause of this statute,[2] the majority concludes that Congress expressly intended each accused at court-martial to enjoy a statutory entitlement[3] to an expert consultant with professional qualifications "reasonably comparable to those of the Government expert."

I find no such intent in either the language or history of Article 46.  I do not regard as surplusage the clause "in

---

[1] Act of May 5, 1950, ch. 169, § 1 (Article 46), 64 Stat. 122 (current version codified at 10 U.S.C. § 846 (2000).

[2] United States v. Warner, __ M.J. __, __ (2)(C.A.A.F. 2005).

[3] As distinct from one arising under the United States Constitution, Supreme Court precedent, or any other source.

accordance with such regulations as the President may prescribe." And I believe we have no power to usurp the President's authority to promulgate regulations in implementation of statute. I much prefer to consider and apply the rights, benefits, and restrictions made applicable to government funding of defense experts by the Sixth Amendment, Article 46, Supreme Court precedent, the Federal Rules of Criminal Procedure, and our own decisions over the past half century in determining whether the military judge abused his discretion in this case. I conclude that he did not, and I would affirm.

In one of our earliest examinations of Article 46, this Court began by discussing the Sixth Amendment, then quoting the first clause of Article 46 itself, followed by a partial recitation of Manual for Courts-Martial, United States (MCM)(1951 ed.) ¶ 115a, and noting that "this Article of the Code, and the regulations prescribed by the President in furtherance thereof, generally conform with the rules and procedure followed in civilian Federal courts."[4]

After quoting the entirety of Fed. R. Crim. P. 17(b),[5] we concluded by saying: "It is readily apparent that the only

---

[4] United States v. Sweeney, 14 C.M.A. 599, 602-03, 34 C.M.R. 379, 382-83 (1964).

[5] "Indigent Defendants. The court or a judge thereof may order at any time that a subpoena be issued upon motion or request of

2

substantial difference between Rule 17(b) and paragraph 115a is the necessity for the civilian defendant to aver that he [or she] does not have the means to pay the necessary costs attendant upon the witnesses' appearance."
14 C.M.A. at 602, 34 C.M.R. at 382.  In another early interpretation, we relied entirely on state and federal decisions and the Federal Rules of Criminal Procedure in determining the scope and meaning of Article 46:  "A military accused, just as a civilian defendant, has the right to prepare to meet charges pending against him.  He, too, is entitled to compulsory process for the production of witnesses and other evidence."[6]  I am mystified by how we came from that position to today's rejection -- not only of Supreme Court precedent, federal and state decisional law, federal rules, the Sixth Amendment, and the President's implementation of Article 46 -- but our own long-standing precedent[7] as well.  Although the Rules

---

an indigent defendant.  The motion or request shall be supported by affidavit in which the defendant shall state the name and address of each witness and the testimony which he is expected by the defendant to give if subpoenaed, and shall show that the evidence of the witness is material to the defense, that the defendant cannot safely go to trial without the witness and that the defendant does not have sufficient means and is actually unable to pay the fees of the witness."

[6] United States v. Aycock, 15 C.M.A. 158, 162, 35 C.M.R. 130, 134 (1964)(citations omitted).
[7] The majority's new rule implicitly modifies, among others, United States v. Garries, 22 M.J. 288 (C.M.A. 1986); United States v. Gonzalez, 39 M.J. 459 (C.A.A.F. 1994); United States

for Courts-Martial (R.C.M.) are created by the President, rather than Congress, we should heed the reasoning of our superior court before we assume the power to amend or create those rules:

> Congress has the power to prescribe rules of procedure for the federal courts, and has from the earliest days exercised that power. . . . The power of this Court to prescribe rules of procedure and evidence for the federal courts exists only in the absence of a relevant Act of Congress.[8]

### FACTS

So flawed is this case, in both facts and posture, as a vehicle for the majority's usurpative pronouncement, that I am compelled to start from the beginning, accepting only the lead opinion's recitation of the facts of the crime and the procedural events. Fortunately, I have the correct findings of fact by the military judge and the well reasoned decision of the court below to serve as guideposts.

Relevant facts are drawn from the record of trial, and we accept the factual findings of the courts of criminal appeals unless they are clearly erroneous. United States v. Burris, 21 M.J. 140, 144 n.7 (C.M.A. 1985), cf. United States v. Barron, 52 M.J. 1, 6 (C.A.A.F. 1999). The averments of counsel during motions practice and oral argument may be informative, but they

---

v. Ndanyi, 45 M.J. 315 (C.A.A.F. 1996); and, particularly, United States v. Ford, 51 M.J. 445 (C.A.A.F. 1999).

[8] Palermo v. United States, 360 U.S. 343, 353 (1959)(internal citations omitted).

4

are not evidence.  United States v. Loving, 41 M.J. 213, 238 (C.A.A.F. 1994).  Confining the facts to those in the record of trial, or as found by the court below, we must accept that:

A.  Neither Dr. Susan Brown nor Dr. Wilbur Smith testified on the motion at trial.

B.  Dr. Brown's sworn affidavit, admitted on the motion at trial, Appellate Exhibit (A.E.) X, details her education and experience in dealing with child abuse, including her board certification in pediatrics and adolescent medicine.  Her primary expertise is in adolescent medicine, but she has significant training and experience in child abuse other than sexual abuse and other than with adolescents.  Unlike Dr. Smith, Dr. Brown has testified in twenty to twenty-five courts-martial, is a career officer, and has experience with both the military medical structure and the medicolegal aspects of practice.  Specifically addressing her qualifications with respect to shaken baby syndrome, Dr. Brown averred:

> I have been an expert consultant and/or witness in about 20-25 courts-martial.  I have testified about child pornography, child sex abuse and various other aspects of child abuse such as perforated bowel, fractures, failure to thrive, burns, skin manifestations of abuse, children's memory and suggestibility and Munchausen's syndrome by proxy.  My specialties are adolescent medicine and pediatrics.  In the area of child abuse, I have the most direct clinical experience with child sexual abuse.  I have not, however, been a consultant or witness at trial for Shaken Baby Syndrome.  Even though, I feel competent in this area of child abuse, specifically

5

> Shaken Baby Syndrome, I am not the equivalent of Dr. Stephen Boos. There are other physicians who are better qualified than me when it comes to "Shaken Baby" cases.

A.E. X at 29 (emphasis added).

Dr. Brown was appointed by the convening authority as an expert consultant to the defense team on April 3, 2001, six weeks prior to trial.[9] Id. at 19.

C. The defense provided no affidavit, testimonial substitute, or synopsis (either as to expected testimony or as to how Dr. Smith could assist the defense) in support of their request to the convening authority that Dr. Smith be appointed "an expert consultant to assist the Defense in the preparation and defense in this case, and possibly to testify as a witness . . . ." Id. at 9 (emphasis added). In fact, both the request to the convening authority and trial defense counsel's motion to compel appointment of Dr. Smith are devoid of any averment that defense counsel had even spoken with Dr. Smith regarding the latter's qualifications or what he could do for the defense.

---

[9] The majority cites several declarations of counsel, not part of the record of trial, but appended to the appellate record by this Court's order, to support this Court's factual findings regarding how Dr. Brown was appointed. Article 67, UCMJ, 10 U.S.C. § 867 (2000), does not empower this Court to engage in factfinding. Marking an appellate exhibit, making a declaration, or making a proffer does not constitute evidence. Cf. John W. Strong et al., McCormick on Evidence §§ 51-52 (5th ed. 1999).

United States v. Warner, 59 M.J. 573, 578 (A.F. Ct. Crim. App. 2003).

D.  In a written pretrial motion, the defense sought appointment of Dr. Smith as a replacement for Dr. Brown. Therein, counsel made averments of "fact" (which included opinion and conjecture) as to the qualifications of both Dr. Smith and Dr. Brown; however, the defense "evidence" in support of these averments consisted only of an unattested curriculum vitae (CV) attributed to Dr. Smith and a sworn affidavit from Dr. Brown.  The defense provided no affidavit or other testimonial substitute regarding Dr. Smith's qualifications, how Dr. Smith could help the defense, or any indication that the defense had discussed matters of substance with Dr. Smith.  The defense eschewed their entitlement to a session pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a)(2000), on this motion,[10] at which counsel could have presented the required evidence, or even examined Dr. Brown under oath to support his attack on her credentials.  In that same motion, the defense contended that Dr. Brown would not be available to assist the defense in the two weeks immediately prior to trial.  The Government filed no response, and the military judge made the following findings:

---

[10] R.C.M. 905(h) provides that:  "Upon request, either party is entitled to an Article 39(a) session to present oral argument or have an evidentiary hearing concerning the disposition of written motions."

1.   The time period for the Government to reply as provided for in the Air Force Rules having expired, and no request for extension of time having been filed, the court deems the Government to have waived its right to reply.

2.   For purposes of this motion, the defense statement of facts is accepted.

3.   Since the convening authority has already determined that a defense consultant is necessary and appropriate and will be provided, the court does not need to act in that regard.

4.   Defense counsel have requested the court to direct that Dr. William Smith be retained to act as a defense expert consultant and potential witness in lieu of the convening authority approved expert, Doctor (LtCol) Susan Brown.   They base this request on two primary grounds.   First, they assert Dr. Brown is neither sufficiently qualified in the relevant field, that is, shaken baby syndrome, nor are her qualifications of a stature reasonably close to those of the government's expert.   Second, they complain Doctor Brown will not be available to assist them during the crucial two-week period before trial.   Doctor Brown will apparently be on a humanitarian mission, out of the country, out of telephone contact in that two-week period, returning in the eve of the trial.

Based on the foregoing, the court issues the following orders:

5.   The defense request for the appointment of Doctor Smith is DENIED.

6.   The defense request for the appointment of a new expert consultant is GRANTED.   This decision is based solely on the matter of Doctor Brown's availability. The court can think of no more critical period when counsel need the services of this expert than the two weeks before trial.   Since Doctor Brown is an active duty service member, her schedule is totally within the control of the Air Force.   Sending her out of country for the two weeks before trial denies the accused a fundamental right to which the convening authority has already determined he is entitled.

8

> 7.  The court has neither considered nor ruled upon
> defense counsel's expressed concerns about Doctor
> Brown being substantially less qualified than the
> Government expert in their comparative stature.  It is
> unnecessary to do so in light of the ruling in the
> previous paragraph.  But the court is mindful of the
> multitude of cases on the subject, many of them
> referred to in the defense brief, and strongly
> suggests any new expert consultant appointed have the
> expertise and experience to meet the threshold
> criteria of the appellate court decisions.

A.E. VIII at 1-2 (emphasis added).

E.  Still prior to trial, the military judge was apprised by both counsel that Dr. Brown's scheduled pretrial absence had been cancelled.  The trial counsel asked the military judge to reconsider his earlier ruling, the defense did not object, and the military judge then made substantive findings of fact regarding the qualifications of Dr. Brown and Dr. Boos, incorporating their CVs in his findings of fact.  As to Dr. Smith, the military judge noted only that the defense had requested him, making no findings as to his qualifications.  In that order (attached to this opinion as an appendix), the military judge expressly rescinded his prior order.  In denying Appellant's request for Dr. Smith and approving appointment of Dr. Brown as a defense expert consultant, the military judge ruled:

> An individual provided to the defense to act in the
> capacity of an expert consultant need not be the
> premier expert in the field.  Rather, the consultant
> must be professionally qualified in a relevant field

of expertise, and be capable of analyzing court issues germane to that field and providing expert opinions and advice to the defense team.  Based on the information provided, the court finds Doctor Brown is competent to act as a consultant in the area of child abuse, and specifically shaken baby syndrome.

A.E. V at 2 (emphasis added).

F.  At trial, when offered the opportunity to present evidence and have the motion reconsidered by the military judge, Appellant's counsel affirmatively declined.  At no time did defense counsel make an offer of proof regarding any interview of, or statements by Dr. Smith.  Further, there is no evidence that the defense used Dr. Brown -- despite her appointment to the defense team six weeks prior to trial -- to assist them in making a more credible request for the services of Dr. Smith, to obtain a different expert consultant, to review defense theories and offer advice, or to identify any potential expert witnesses.

G.  As the majority notes, in a ruling and order dealing solely with Dr. Brown's anticipated unavailability, the military judge included the statement:  "'[f]or purposes of this motion, the defense statement of facts is accepted.'"  Warner, __ M.J. at __ (8).  That lengthy statement of "facts" included defense counsel's opinions, averments, and conjecture.[11]  Notwithstanding the military judge's express, affirmative exclusion of the issue

---

[11] Referred to on one point by the military judge as an "assert[ion]."

of professional qualifications from that ruling, and the military judge's later express rescission of that ruling, the majority reasons that to avoid a "cumulative and problematic" effect, the opinions and conclusions of defense counsel and Dr. Smith's unattested CV, must now become unassailable "facts of record," Warner, __ M.J. at __ (8-9 n.11), which bind this Court.[12] To the contrary, it could not be more glaringly apparent that, in his first order, the military judge accepted certain facts for the purpose of expeditiously dealing only with the question of Dr. Brown's availability, while expressly excluding consideration of qualification issues. Only in his second ruling, which rescinded the first, did the military judge address questions of professional qualifications.

H. Although the defense avoided every opportunity either to put on evidence or make an offer of proof, in their motion, A.E. X, counsel averred, among other things, that Dr. Smith had "taught, lectured on pediatric radiology and child abuse," "has written numerous publications on head trauma and brain injury," "has extensive experience in diagnosing head trauma in infants,"

---

[12] As the actual text of the military judge's first order makes abundantly clear, the military judge made no factual findings whatsoever pertaining to the qualifications of either expert. If the plain language of that order were not enough, however, the military judge's later ruling, expressly rescinding the first, should leave no doubt whatsoever that the military judge's only findings related to qualifications are those stated in his later ruling.

and "has the training and experience in evaluating cases like BT's."[13]

I.  If this Court had factfinding authority, we could conclude from Dr. Smith's very lengthy CV that he:  is an expert in radiological detection of a vast array of injuries and disorders, has significant experience and academic credentials in the area of traumatic child injury and abuse, and is an experienced lecturer and author in both areas.  However eminent and well qualified Dr. Smith may actually be, neither the CV nor any other <u>evidence</u> offered by the defense (or even an offer of proof) supports a conclusion that Dr. Smith is an eminent or leading expert in shaken baby syndrome, that he has ever treated any children for shaken baby syndrome, or that he has any expertise in forensic pediatrics or other specialties that might establish his ability to assess causes of injuries or "suggest alternative theories" for the defense.

---

[13] A.E. X at 3.  Accepting this last statement as <u>fact</u>, which the majority insists we must do, is problematic for Appellant. Because the defense facts establish no substantive contact between defense counsel and Dr. Smith, we must conclude that the defense counsel had the experience and training to have evaluated BT's "case," compared it with other cases in which Dr. Smith had been involved, and concluded that BT's case was medically and forensically similar to those other cases.  This familiarity demonstrates not only that the defense needed very little in the way of an expert consultant, but also that the defense had more than adequate knowledge upon which to interview potential defense experts and effectively cross-examine Dr. Boos at trial, which the defense certainly did, perhaps with Dr. Brown's help.

J.  As reflected in the record of trial, and as found by both the military judge and the court below, at no time prior to, or during, the proceedings did Appellant request Dr. Smith as an expert witness, nor did he request any other expert witness.

## DISCUSSION

The majority opinion improperly augments the record of trial with Appellant's arguments and averments and rewrites not only our precedent, but R.C.M. 703 and Article 46, as well. Rejecting the findings of fact by the military judge and the court below without determining that such findings were clearly erroneous, the opinion finds new sources of evidence to support the conclusion that Dr. Brown was not an "adequate substitute" for Dr. Smith.  Enigmatically, this result is obtained not because Dr. Brown's credentials were not equivalent to those attributed to Dr. Smith, but because Dr. Brown did not possess "professional qualifications . . . reasonably comparable to those of the Government's expert."  Warner, __ M.J. at __ (22-23).

The majority opinion does not conclude that the military judge and the court below failed to properly consider Article 46, R.C.M. 703, or the relevant precedent of this Court and the Supreme Court.  Rather, based on their own factfinding, the majority opinion concludes that both the military judge and the

13

court below abused their discretion "because they were influenced by an erroneous view of the law." __ M.J. at __ (16-17). The opinion offers no standard by which the military judge's abuse was measured, nor an explanation as to how the military judge could have held an "erroneous view of the law" when the law in question had yet to be invented, whole cloth, by this Court some four years after his ruling. Just as in United States v. Wiesen:

> My analysis shows that the trial judge did not abuse his discretion in this case. The judge exercised his discretion with no knowledge that this Court would expand the law as the majority does today. When the judge made his ruling that is overturned today by the majority, there was no case law suggesting this holding. Interestingly enough, the majority cites no case law as support for this new extension of the law.

56 M.J. 172, 183 (C.A.A.F. 2001)(Sullivan, J., dissenting).

Finally, usurping the power given only to Congress and the President to legislate or promulgate evidentiary and procedural rules, the opinion rewrites Article 46 and R.C.M. 703(d) to incorporate their new rule. The result is a retrospective rule that will alter the landscape of every court-martial now on appeal or yet to be tried, that involves either a Government expert consultant or expert witness. To borrow a phrase, "we are left here with a jerry-built house of cards on a foundation of shifting sands." Backus Plywood Corp. v. Commercial Decal, Inc., 208 F. Supp. 687, 696 (S.D.N.Y. 1962).

There are three critical propositions raised by the majority opinion with which I take particular issue.

A. "ADEQUATE SUBSTITUTE"

The quoted language of R.C.M. 703(d) has never been applied, nor was it ever intended to apply, to a Government expert, rather than to an expert requested by the defense and denied by the Government. The majority opinion's claim that such a construction is a means to satisfy congressional intent underlying Article 46 is, unsurprisingly, completely unsupported by any citation to supporting authority; its ipse dixit character is self-evident.

"Adequate substitute" is not defined in the R.C.M. Nonetheless, this Court has employed "competent assistance" to measure the concept. See Ndanyi, 45 M.J. at 319 holding that "As long as the Government was willing to provide competent assistance at government expense -- which the defense preemptively rejected -- the Government's burden was satisfied. The defense could either accept such assistance or look to its own resources."). As we have stated:

> An accused is not . . . entitled to a specific expert of his own choosing. All that is required is that competent assistance be made available. As this Court observed in United States v. Garries, 22 M.J. 288, 290-91 (1986), "In the usual case, the investigative, medical, and other expert services available in the military are sufficient to permit the defense to adequately prepare for trial."

United States v. Short, 50 M.J. 370, 372-73 (C.A.A.F. 1999)

(citation and quotation marks omitted), cert. denied, 528 U.S.

1105 (2000).[14]

Neither these cases, nor the text, comments, or analysis of

R.C.M. 703 contain even a suggestion that "adequate substitute"

is to be measured against any standard other than the expert

requested by the defense.  See, e.g., Ndanyi, Ford, Garries, and

Gonzales.[15]

---

[14] In Short, the Court, in a 3-2 opinion, held there was no abuse
of discretion in denying Appellant Government expert assistance.
50 M.J. 373.  Short sought certiorari before the Supreme Court.
Brief for the United States in Opposition at 1, Short v. United
States, 528 U.S. 1105 (2000)(No. 99-362), 1999 WL 33633132
(U.S.), at *1.  The Solicitor General asked the Supreme Court to
deny certiorari and argued that "[l]ike Ake," Federal cases "do
not stand for the more general proposition asserted by
petitioner of a right to government-funded expert assistance of
the defendant's choice without a showing of necessity."  Id. at
7-8, 1999 WL 33633032 at 7-8.  This was partially in reliance on
the papers of Justice Marshall as to the right to an expert in
Ake v. Oklahoma, 470 U.S. 68 (1985), where Chief Justice Burger
concurred in the result because Justice Marshall would not limit
the expert assistance to a "capital case."  Benjamin Weiser &
Joan Biskupic, Marshall Lawyer Tries to Close Access to Papers,
Wash. Post, May 25, 1993, at A1.

[15] The majority correctly observes that Ford, Gonzalez, and
Ndanyi do not expressly mention Article 46 and that only Garries
does.  Ford, Gonzalez, and Ndanyi, however, all apply the
criteria from Garries (which became the Gonzalez test), relying
heavily on Article 46.  In Ndanyi, this Court recognized that
the third prong of that test included analysis of the adequacy
of government-substituted consultants and assistants.  45 M.J.
at 319-20.  That test will now either be modified or rejected
altogether.  In addition, these opinions, and many others, are
rife with language inconsistent with the majority's opinion.

However, the majority distinguishes this line of cases as arising merely from the United States Constitution and the Supreme Court, and then finds in Article 46 a manifestation of congressional intent that has lain dormant for over fifty years.

The first sentence of Article 46 provides that "[t]he trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence <u>in accordance with such regulations as the President may prescribe</u>." Emphasis added. While insisting that the plain text of Article 46 compels their conclusions, the majority gives such dispositive weight to the first clause of Article 46 that the second clause is rendered virtually meaningless. As a result, this Court is now prescribing regulations, relegating the President to the ministerial function of summarizing the Court's implementation of Article 46 in the next edition of the <u>MCM</u>. This, Congress did not intend.

Having insisted on this path in a case dealing not with expert witnesses but with consultants, <u>the other shoe is likely to drop soon</u>.[16] When it does, and this Court is asked to apply that same congressional intent to substitute defense

---

[16] <u>See, e.g.</u>, <u>United States v. Bresnahan</u>, __ M.J. __, __ (2) (C.A.A.F. 2005) (Erdmann, J., dissenting). Before the ink on today's majority opinion has even dried, one member of that majority would cite it in support of lowering the evidentiary threshold the defense must meet to acquire a government-funded expert consultant.

17

investigators and substitute laboratory assets, where will the Court look in Article 46 to find that Congress did not intend that such assets also be "reasonably comparable to those of the government"?

Congress included the second clause of Article 46 for good reason. It is within the President's discretion to regulate how and by what measure "equal opportunity" is to be applied. Unless we are prepared to hold the President's implementation of Article 46 to be in violation of either the article itself or some higher authority, we are not at liberty to strike it down or amend it.

After today, once the defense demonstrates the need for an expert consultant and/or requests a particular consultant, this Court's new rule will require that the Government either: (1) pay for the consultant the accused has requested (with the obvious danger that the accused may exercise his right to a more highly qualified expert should the Government procure an expert with qualifications superior to those of the accused's first expert), or (2) without regard to the credentials of the requested expert, procure for the defense a substitute with "professional qualifications . . . reasonably comparable to those of the Government's expert." Warner, __ M.J. at __ (22-23)(emphasis added).

18

This process is certainly not compelled by Article 46 and thus usurps the President's authority to implement that statute as he chooses, as long as that implementation does not violate Article 46 or some higher authority. See R.C.M. 703.

Claiming to rely on "the plain wording of Article 46" in divining this newfound "congressional intent" to provide near absolute equality of trial team resources, the majority utterly rejects the context in which Article 46 was enacted and eviscerates the President's rulemaking authority. Because we are neither Congress nor the President, I must respectfully decline to join the majority's speculation.

B. DR. BROWN VS. DR. SMITH

Setting aside for the moment the majority's reinventing of Article 46 and R.C.M. 703, the question becomes whether Dr. Brown was an "adequate substitute" for Dr. Smith as an expert consultant. There is no evidence to support the majority's contention that Dr. Brown was either unqualified or measurably less qualified than Dr. Smith to serve the defense as an expert consultant.

Counsel are advocates. Their role is to argue the facts, sometimes quite creatively. "After all, advocates . . . are like managers of pugilistic and election contestants in that

they have a propensity for claiming everything."[17]   What is not evidence, is not an offer of proof,[18] and is not before this Court as anything other than unsupported argument is that which counsel have "averred" in written pretrial motions:  "that based on the defense counsel's conversations with Dr. Brown, the defense counsel believed she would merely 'defer' to the opinions of Dr. Boos"; and "that while Dr. Brown 'is able to advise the defense generally on the timing of the injuries,' she could not advise the [d]efense concerning 'possible alternative explanations.'"  Warner, __ M.J. at __ (8).  Also not evidence -- particularly in the face of a contrary holding by the court below -- are counsel's arguments that Dr. Smith could provide something to the defense that Dr. Brown could not.  Warner, 59 M.J. at 579-80.

After exhalting defense counsel's recitation of facts, in which Dr. Brown's affidavit was incorporated, the majority enigmatically refers to Dr. Brown as a "generalist with no apparent expertise in [shaken baby syndrome]," Warner, __ M.J. at __ (12), and concludes that "neither the Air Force Court nor the dissent has identified anything in the record demonstrating that Dr. Brown had any experience in the area of shaken baby

---

[17] First Iowa Hydro-Elect. Coop. v. Federal Power Comm'n, 328 U.S. 152, 187 (1946) (Frankfurter, J., dissenting).

[18] See Military Rule of Evidence (M.R.E.) 103(a)(2).

syndrome." Id. (emphasis added). To the contrary, in an affidavit appended to the very defense motion that the majority hails as the facts of record, A.E. X at 29, Dr. Brown swore that "I feel competent in this area of child abuse, specifically, Shaken Baby Syndrome . . . ." In A.E. V at 1, the military judge found that Dr. Brown had "14 years of experience in pediatrics, including her periods of internship and residency. Further, she has continued post graduate training in child abuse and forensic pediatrics . . . ." I am unwilling to assume that Dr. Brown was born with the competence she claimed, or to assume that, as a Lieutenant Colonel in the Air Force, she was willing to lie under oath about her competence, or to assume that in the course of fourteen years of pediatric practice in military hospitals and post graduate training in forensic pediatrics, she had no experience in shaken baby cases upon which to base her sworn assessment of competence.[19]

In declining to put his appointed consultant on the stand to expose her allegedly deficient experience and her unsuitability as a consultant,[20] Appellant failed to meet his

---

[19] As we are without factfinding power, I am unwilling to entertain the proposition that because a contrary conclusion "could have been" reached by a lower court, we may reject that court's findings of fact on that basis. Warner, __ M.J. at __ (12-13 n.20).

[20] In Garries, the defense rejected an appointed, confidential, defense investigator and was then properly denied $1500 for an

21

burden.  Rather than recognize that, the majority rewards this practice by applying unwarranted presumptions to the detriment of Dr. Brown's sworn, candid statement of competence, while applying nearly opposite presumptions in favor of Dr. Smith's unsworn CV, and then elevating defense counsel's unsupported averments to evidentiary status by reviving a rescinded ruling of the military judge.  In so doing, the majority rejects the credibility determinations of the trial judge and substitutes their own factual findings for those of both the trial judge and the court below.

The record firmly supports the determinations of the military judge and the court below that Dr. Brown was qualified, not as an eminent expert in the field of shaken baby syndrome, but to serve as a defense consultant on shaken baby syndrome.[21]

---

"independent investigator" because the defense failed to demonstrate why the government-appointed asset would not fulfill their needs.  22 M.J. at 291.  Claiming not to overrule or modify Garries, the majority finds, not just that an experienced pediatrician with forensic training was incapable of even recommending an expert witness or another consultant, but that the level of assistance is now to be measured against the credentials of the Government expert.  If Garries were tried tomorrow, the defense would be entitled to their choice of the $1500, or an investigator with "reasonably comparable" credentials to those of the Government investigator.

[21] Both the assignment of weight and the comparative determination of credibility involving Dr. Smith's unattested CV and the sworn affidavit of Dr. Brown are components of factfinding within the purview of courts with factfinding authority.

Appellant's trial defense counsel elected to support his motion with nothing other than Dr. Smith's CV -- no statements, no affidavits, no letters, not even an offer of proof.  See A.E. X; R. at 16.  Regardless of what Dr. Smith's qualifications may actually be, nothing in Dr. Smith's CV establishes either that he was an eminent expert in shaken baby syndrome or that he was as qualified in that area as Dr. Boos, the standard against which the majority measures the qualifications of Dr. Brown.  Yet it is that "eminence" on which the majority relies in concluding that only Dr. Smith and, not Dr. Brown, "would have assisted the defense in evaluating, identifying and developing evidence."  Warner, __ M.J. at __ (11).

At trial, defense counsel affirmatively declined to offer any other evidence on the motion, even declining to call his own consultant to the stand, either to expose her weaknesses or to establish a description of a more qualified consultant.

Where the majority has failed, the military judge and the court below succeeded.  They properly considered the evidence of record and, consistent with all known law, assigned to the averments of counsel the evidentiary weight they deserved.  It is in this factual context, and not in that proposed by the majority,[22] that we must determine whether the military judge

---

[22] Because, in the first instance, I see no factfinding power in the "plain language" of Article 67, I am doubly at a loss to

23

abused his discretion in ruling that the expert the Government provided to the defense was "an adequate substitute for the defense-requested civilian expert." Warner, __ M.J. at __ (15). Applying the legal standards recited above, and after reviewing the facts from the record of trial, it is clear that neither the military judge nor the court below abused their discretion in ruling on this issue.

C.   ABSENCE OF ERROR OR PREJUDICE

No error occurred at trial involving (1) the testimony of Dr. Boos, (2) the effectiveness of the defense attack on that testimony, or (3) the defense's opportunity to receive expert advice or present their own expert testimony.

Appellant made no request before or during trial for an expert witness, nor did he ever proffer or contend that any expert would offer opinion or testimony contrary to that of Dr. Boos.  Since the defense made no request for any expert witness, the majority's concern for the effect of Dr. Boos' "vastly superior qualifications" at trial is a non sequitor. Warner, __ M.J. at __ (14).

The majority's gymnastic pronouncements seem to require first, an assumption that Congress intended the accused at

comprehend the majority's "bootstrapping" of factual findings from other jurisdictions into their determination of Dr. Smith's expertise. Warner, __ M.J. at __ (20-21).  The implication that it was an abuse of discretion for the military judge not to have adopted factual findings from other courts is mind-boggling.

24

courts-martial to have expert consultants with qualifications "reasonably comparable" to those of the Government's expert consultant or witness; and, second, that if the Government fails to meet this requirement at the consultant stage, Congress intended that this Court substitute conjecture and assumption for the record of trial in evaluating both error and prejudice. I prefer a more traditional analysis.

As noted above, the defense avoided every opportunity to establish, by proffer or evidence, Dr. Smith's qualifications or potential contributions. The defense requested no expert witness. The defense counsel did not object to having Dr. Boos recognized as an expert. Despite having had Dr. Brown available to the defense team for six weeks prior to trial, the defense also avoided every opportunity to expose her lack of qualifications by simply calling her to testify at a motions hearing.

During a session pursuant to Article 39(a), trial counsel stated that Dr. Boos would testify that, in "his professional opinion, as a result of his review of BT's file," when asked to opine on the cause of injury, "instead of responding child abuse, he responds that it was one of two things: either a vigorous shaking or a swinging that was stopped by him hitting a soft object." When the military judge queried the defense for objection, defense counsel responded "No, not at all, sir." In

fact, the defense made no objection to any of Dr. Boos's testimony. On cross-examination, defense counsel elicited alternative theories of injury, including birth defects, prenatal trauma, and trauma during birth, that could explain Dr. Boos's interpretations of the electronic images. Defense counsel also elicited testimony potentially inconsistent with a diagnosis of shaken baby syndrome. The cross-examination established defense counsel's knowledge of the subject, including conditions, diagnostic techniques, and alternative theories for the cause of BT's injuries.

In their opening statement, the defense team conceded that they may not call any witnesses, but cautioned the members not to give too much weight to Dr. Boos's testimony, citing specific areas of practice in which Dr. Boos was unskilled, themes they repeated on closing. The trial counsel's passing mention of Dr. Boos's qualifications in his opening[23] was more than offset by the defense's apparently effective attack on Dr. Boos during cross-examination. Other than arguing the relative importance of Dr. Boos's lack of experience in radiology, neither counsel emphasized expert qualifications in closing. As is the common practice, the military judge instructed the members that they

---

[23] I cannot fail to emphasize that this comment, which the majority finds so egregiously unfair, referred only to fellowship training in child abuse -- no mention of infant abuse or shaken baby syndrome.

should consider Dr. Boos's qualifications as an expert, but "are not required to accept the testimony of an expert witness or give it more weight than testimony of an ordinary witness."

Additionally, the members' findings clearly evince the success of Appellant's defense counsel at trial. The majority's own statement of facts makes plain that Appellant's conviction was assured by his own admissions and the evidence of BT's injuries observed by treating physicians. It is unlikely that Dr. Boos's testimony was either necessary or effective. Facing a charge of assault with a means likely to produce death or grievous bodily harm, Appellant was found guilty of assault on a child under the age of sixteen years -- hardly a ringing endorsement by the court members of Dr. Boos's testimony and certainly no support for any claim that Appellant's counsel was hamstrung by the absence of Dr. Smith.

CONCLUSION

The majority explains its great leap past the record of trial, the findings of the military judge, and the findings of the court below as necessary to prevent the "cumulative and problematic" effect of requiring Appellant to meet his burden under Gonzalez. Warner, __ M.J. at __ (8-9 n.11). As their argument goes, based on a rescinded ruling by the military judge pertaining to a related issue, which ruling expressly declined to make the findings the majority relies on, it would be

27

"cumulative and problematic" to require the defense counsel to present evidence that he had spoken with Dr. Smith, that Dr. Smith had informed the defense how he could help them, that Dr. Smith was qualified in the manner the defense averred, or that Dr. Brown was not. This new catchphrase relieves the defense of its burden to request witnesses or present any evidence on the motion, even when both the R.C.M. and the military judge expressly afforded the defense the opportunity to do so. Further, the risk of a "cumulative and problematic" effect apparently relieved the defense even of the small burden of putting their detailed expert consultant on the stand to demonstrate either that she lied regarding her qualifications, or that she lacked the experience to assist the defense. I am at a loss to understand how the majority's new concern for avoiding the "cumulative and problematic" does not concomitantly restrain their exercise of factfinding powers bestowed by Congress only on the courts below. Nonetheless, without any deference whatever to either the facts found by the military judge -- including the determination of credibility likely applied when weighing Dr. Smith's unattested and unauthenticated CV against Dr. Brown's sworn affidavit -- and by selectively applying inferences to Dr. Smith's CV that they decline to apply to Dr. Brown's affidavit, this Court substitutes its view of the facts for those of both the military judge and the court below.

Finally, to buttress their factual findings, the majority imports factual findings from other cases and jurisdictions.

In affirmatively rejecting all federal precedent and authority, the majority moves us even further from the mainstream of federal practice, without any articulation of the need to do so. Sadly, today's decision continues the majority's increasingly frequent march away from the purpose of Article 46 and the President's implementation thereof in R.C.M. 703.

In United States v. McAllister, 55 M.J. 270, 281-82 (C.A.A.F. 2001)(Crawford, C.J., dissenting), I dissented from the Court's relegation to a mere formality of the defense burden to establish necessity for a particular expertise. The majority's citation of United States v. Kreutzer, 59 M.J. 773, 777 n.4. (A. Ct. Crim. App. 2004), aff'd, 61 M.J. 293 (C.A.A.F. 2005), harbingers their expansion of Article 46 to include a per se right to a mitigation expert in capital litigation regardless of the number of psychiatrists, psychologists, and doctor-lawyers already assigned to the defense team. Warner, __ M.J. at __ (21 n.37). From that proposition, I have also dissented and for the same legal reasons. Kreutzer, No. 04-5006, 2005 CAAF LEXIS 900, at *47-*56 (C.A.A.F. Aug. 10, 2005)(Crawford, J., dissenting).

Today's new proposition, unsupported by the record of trial, that the "denial of a defense expert with professional

29

qualifications comparable to those of the Government's expert interfered" with the defense "opportunity to obtain witnesses and other evidence," Warner, __ M.J. at __ (11), in violation of Article 46, is not only startling, but stands in sharp contrast to this Court's analysis of an Article 46/R.C.M. 703 issue in United States v. Shelton, 61 M.J. __ (C.A.A.F. 2005). In Shelton we assumed that the defense had met their burden in requiring Government production of two defense witnesses, and also assumed an erroneous denial of witness production by the Government. We then tested for prejudice by using the record of trial. If Congress had intended the defense to have "equal opportunity to obtain witnesses," without regard to Presidential implementation, the defense would not be required affirmatively to demonstrate relevance and necessity and defense counsel would have subpoena power. See R.C.M. 703(c)(2)(B)(i); contra R.C.M. 703(e)(2)(C). If the defense has no burden to provide synopses or proffers, every denial of a defense witness will result in presumed prejudice.

The majority's conclusion that "the nature of the legal error -- the denial of a sufficiently qualified expert -- interferes with Appellant's ability to demonstrate prejudice," simply ignores the evidence, the record, and the abilities of even the most junior judge advocate.

    The military society which we serve deserves, and indeed
the American public expects, a military justice system that not
only protects the rights of the accused but also follows
established legal principles and precedents.  When a court
oversteps its authority and ignores its own long-standing legal
precedent, it undermines the public's confidence, as well as
stability and predictability in the military justice system.  If
the risk of a "cumulative and problematic" effect is the
talisman to be wielded by defense counsel wishing to avoid well
established evidentiary burdens, what legal standards should
advocates and military judges employ?  Can they now be confident
when they apply long-standing legal principles, procedures, and
precedent?  Our Constitution contains its own wise restraint on
"cumulative and problematic" effects -- the separation of powers
doctrine.  Will the military society respect a judicial system
that ignores that doctrine as well as prevailing legal standards
and decisions?  And will the American public have confidence
that the intent of Congress in promulgating the UCMJ is being
respected?  I fear not.

    Finally, I question whether the majority's new expert
entitlement rule and "presumed prejudice" factors will benefit
the defense in the context of future trials.  As is evident on
this record, when the Government has denied a defense-requested
expert consultant but provided a substitute, past practice has

been not to focus with particularity on the qualifications of either the requested consultant or the Government consultant, but on whether the substitute was "adequate," in a broad sense. For that reason, CVs and averments have frequently escaped scrutiny and evidentiary objection by trial counsel, since the substitute consultant was to be measured against a relatively fixed standard. As the standard is now purely comparative,[24] every degree, training program, appointment, publication, and lecture is potentially in issue and the battle may be on.

These considerations would normally fall under the purview of the "comprehensive survey" process sagely included by Congress in the UCMJ.[25] The judge advocates general have devoted considerable assets[26] to this process, which produces the vast majority of recommendations for change to both the MCM and the UCMJ, following thorough study, debate, and public notice. We can only hope that our preemption of that rulemaking process does not prove inordinately disadvantageous either to service

---

[24] "[W]e hold that the defense was entitled to an expert who could adequately substitute for Dr. Smith and who had qualifications reasonably comparable to those of the Government expert who testified in the same subject area." Warner, __ M.J. at __ (17).

[25] Article 146, UCMJ, 10 U.S.C. § 946 (2000).

[26] See generally Department of Defense Directive 5500.17, Role and Responsibilities of the Joint Service Committee on Military Justice (May 3, 2003).

members or the reputation of the military justice system that

the majority seeks to benefit.

APPENDIX

## DEPARTMENT OF THE AIR FORCE
## UNITED STATES AIR FORCE TRIAL JUDICIARY
## IN THE WESTERN CIRCUIT

| | | |
|---|---|---|
| U N I T E D   S T A T E S | ) | DECISION RE GOVERNMENT |
| | ) | REQUEST FOR |
| v. | ) | RECONSIDERATION OF |
| | ) | ORDER GRANTING DEFENSE |
| SRA ANTHONY W. WARNER | ) | MOTION FOR APPROPRIATE |
| SSN. - - | ) | RELIEF |
| 366th Equipment Maintenance Squadron | ) | |
| Mountain Home AFB, Idaho | ) | Date: 1 May 2001 |

Subsequent to the ORDER of this court dated 25 April 2001, counsel for both sides advised the court that Doctor Brown's TDY had been canceled and she would be available to advise the defense team. At that time, trial counsel requested the Court reconsider its ruling. The Defense having interposed no objection, the Government Request for Reconsideration is GRANTED. After reviewing the briefs of both counsel, submitted before (DC) and after (TC) the Court's earlier ruling, the Court finds as follows:

## FACTS

1. On or about 16 March 2001, the Defense submitted a request to the convening authority to appoint an individual to act as a defense expert consultant and possibly expert witness. Doctor Wilbur Smith was specifically requested.

2. On or about 15 March 2001, as a result of earlier discussions, the Government informed Defense Counsel they were proposing Doctor (Lt Col) Susan Brown as a defense consultant. Her curriculum vitae was provided to the defense on 16 March 2001.

3. On or about 3 April 2001, 12 AF/CC appointed Doctor Brown as a defense expert consultant.

4. Doctor Brown is a physician, Board certified in both pediatrics and adolescent medicine. She has approximately 14 years of experience in pediatrics, including her periods of internship and residency. Further she has continued post graduate training in child abuse and forensic pediatrics, and performed as an expert consultant and/or witness in over 20 trials. Doctor Brown's curriculum vitae, as attached to the defense original motion, is incorporated herein by reference to the extent not summarized herein.

5. Doctor (Lt Col) Stephen Boos is the government-retained expert. Doctor Boos is a physician, Board certified in pediatrics and a Fellow of the American Academy of Pediatrics. He has approximately 18 years of experience in pediatrics, including his period of residency. He has made numerous presentations on the subject of child sexual and physical abuse, has published a few articles in the field, and is presently the Air Force consultant on child abuse and neglect.

Appellate Exhibit IV

Offered Page 14

Page 1 of 2

Doctor Boos' curriculum vitae, as attached to the defense original motion, is incorporated herein by reference to the extent not summarized herein.

## FINDINGS AND CONCLUSIONS

6. An accused and his counsel are entitled to the assistance of an expert consultant to help them understand technical aspects of their case and to assist in the formulation of a theory of defense and how to best meet the challenge of the government's evidence. This consultant enjoys the cloak of privilege and can therefore be fully immersed in the tactical decision-making process of the defense. However, the appointment of an expert consultant does not relieve the defense counsel of the responsibility of independently researching and studying the relevant subjects in contention. In other words, a consultant is provided to assist counsel, not do their job for them.

7. An individual provided to the defense to act in the capacity of an expert consultant need not be the premier expert in the field. Rather, the consultant must be professionally qualified in a relevant field of expertise, and be capable of analyzing court issues germane to that field and providing expert opinions and advice to the defense team. Based on the information provided, the court finds Doctor Brown is competent to act as a consultant in the area of child abuse, and specifically shaken baby syndrome.

8. An expert witness is not the same as an expert consultant. RCM 703(d) authorizes the employment of defense expert witnesses at government expense when their testimony can be shown to be relevant and necessary, and the government cannot or will not provide an adequate substitute. Defense counsel have complained that Doctor Brown is not an "adequate substitute" for Doctor Smith, their requested expert. But, defense counsel have not proffered what testimony Doctor Smith would provide to the court. Thus, it is impossible to determine if his testimony is relevant and necessary. Furthermore, the term "adequate substitute" does not mean someone with equal credentials to the requested witness. It does mean a witness who is professionally qualified by virtue of education and experience to testify about the subject at hand, and whose scientific views or opinions are consistent with those of the requested individual. Since defense counsel have not provided the court or convening authority any clue what Doctor Smith's testimony would be, they have no basis to complain that Doctor Brown is not an adequate substitute.

## ORDER

The order of this court dated 25 April 2001, granting the defense request for the appointment of a new expert consultant is RESCINDED. The defense request for the appointment of a new expert consultant and witness is DENIED.


ROBERT G. GIBSON, JR., Colonel, USAF
Chief Circuit Military Judge